FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

2018 JAN 30  PM 2: 30

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

DISABILITY RIGHTS FLORIDA, INC.,
On behalf of its Clients and Constituents,

　　　　Plaintiff,

vs.

Case No. 3:18-cv-179-J-25JRK

JULIE JONES, Secretary, Florida Department
Of Corrections in her Official Capacity and
FLORIDA DEPARTMENT OF CORRECTIONS,
an Agency of the State of Florida,

　　　　Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Disability Rights Florida, Inc., hereby sues Defendants Julie Jones, in her

official capacity as Secretary of the Florida Department of Corrections, and the Florida

Department of Corrections, an agency of the State of Florida, alleging unconstitutional and

statutorily inadequate provision of mental health treatment and services for inmates housed in the

Florida Department of Corrections' inpatient mental health units.

### NATURE OF THE ACTION

This is a civil action for declaratory and injunctive relief brought by Disability Rights

Florida, an organization empowered and charged by federal law to protect the rights of

individuals with mental illness in Florida. Disability Rights Florida has standing to bring this

action on behalf of its numerous clients and constituents confined in the inpatient mental health

units run by the Florida Department of Corrections (FDC). Defendants, by their actions and

inactions, have deliberately and chronically denied mental health care to inmates with mental

illness who were, and are, confined in the inpatient mental health units. Many of these inmates are confined in segregated, isolated and harsh conditions which exacerbate their illnesses. As a result of their segregation and isolation, these inmates are denied the benefits of many of the FDC's programs, services and activities. Defendants know that the denial of care and imposition of harsh conditions expose Plaintiff's clients and constituents housed in these inpatient mental health units to serious mental and physical harm or a substantial risk of serious mental and physical harm. Defendants' failure to provide constitutionally adequate mental health care to these inmates in non-segregated and therapeutic environments violates the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act, 42 U.S.C. §12132, and the Federal Rehabilitation Act, 29 U.S.C. §794.

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States, and pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. §12132 and the Federal Rehabilitation Act (FRA), 29 U.S.C. §794.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331. Declaratory and injunctive relief are authorized by 28 U.S.C. §§2201 and 2202.

3.      Venue lies in this district pursuant to 28 U.S.C. §1391 as a substantial part of the events or omissions giving rise to this claim occurred in this district.

## PARTIES

4.      Plaintiff, Disability Rights Florida, Inc., is the Protection and Advocacy System (P&A) mandated under federal law to "ensure that rights of individuals with mental illness are protected." 42 U.S.C. §10801(b)(1). The Protection and Advocacy for Individuals with Mental

2

Illness Act, 42 U.S.C. §10801, *et seq.*, provides for the establishment and funding of systems within each state that are designed to protect and advocate for the rights of individuals with mental illness, as well as to investigate incidents of abuse and neglect of those with mental illness. Federal funding is provided to independent agencies or organizations which have the capacity to protect and advocate for the rights of individuals with mental illness. 42 U.S.C. §§10804, 10805. The system established by each State to protect and advocate for the rights of mentally ill individuals must have the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." 42 U.S.C. §10805(a)(1)(B). Disability Rights Florida is designated as the P&A for the State of Florida under the Protection and Advocacy for Individuals with Mental Illness Act.

5.     As a P&A, Disability Rights Florida is tasked under law to protect and advocate for the rights of individuals with mental illness to ensure the enforcement of the Constitution and Federal and State statutes. 42 U.S.C. §10801(b)(2)(A). Disability Rights Florida has the legal responsibility to investigate allegations of abuse and neglect involving individuals with mental illness and to advocate for appropriate treatment and programs for such individuals. Disability Rights Florida also has the legal responsibility to ensure that the legal and civil rights of individuals with mental illness are protected; that these individuals are treated with dignity and respect; and that these individuals receive appropriate services to address their needs. To ensure the fulfillment of these legal responsibilities, Disability Rights Florida has the authority to sue the State and its agents to protect individuals with mental illness who are receiving care and treatment from the State or its agents. 42 U.S.C. §10805(a)(1)(B); *see also Doe v. Stincer*, 175 F.3d 879 (11th Cir. 1999).

3

6.      Disability Rights Florida has a multi-member board of directors that includes persons with disabilities.  Disability Rights Florida has an advisory council composed of people with disabilities who have significant input into the goals and objectives of the organization. Disability Rights Florida provides the opportunity for the public, including its stakeholders, to comment on its goals and objectives.  One of Disability Rights Florida's primary responsibilities is to investigate the failure of public entities to comply with laws protecting Disability Rights Florida's members, clients and constituents.

7.      Disability Rights Florida brings this action on behalf of inmates within the Florida Department of Corrections (FDC) who are currently clients and constituents of the P&A and who are mentally ill and confined in the FDC's inpatient mental health units or who may be transferred to the FDC's inpatient mental health units. These clients and constituents are confined in "facilities" rendering care and treatment for the mentally ill as that term is defined in 42 U.S.C. §10802(3).

8.      Plaintiff has no adequate remedy at law.  Unless enjoined by this Court, Defendants will continue to subject Plaintiff's clients and constituents to violations of their statutory and constitutional rights.

9.      Defendant, Julie Jones, (Secretary) is the Secretary of the FDC.  Defendant Secretary is sued in her official capacity for the purpose of obtaining injunctive relief.  Defendant Secretary has the statutory authority to implement the relief sought in this Complaint. *See* Fla. Stat. §20.315(3).

10.     Defendant FDC is an agency of the State of Florida and administers and operates the Florida prison system, including the FDC's inpatient mental health units.

4

11.     Defendant FDC is a program or activity that receives federal financial assistance and is governed by the FRA.

12.     Defendant FDC is a public entity within the meaning of Title II of the ADA.

## STATEMENT OF THE FACTS

### A Brief Overview of the FDC Inpatient Mental Health Care System

13.     Approximately 18,000 inmates in the custody of the FDC have a diagnosed mental illness that requires mental health treatment.  The FDC acknowledges that many of these inmates have symptoms so severe that they require intensive inpatient mental health treatment.

14.     The FDC currently operates ten inpatient mental health units in institutions around the state providing treatment to approximately 1,200 inmates whose mental illness significantly impairs their ability to function in a general prison environment.

15.     The inpatient mental health units serve more than just the inmates within each institution. The FDC operates the units as a state-wide system serving inmates from any institution in the state.  Admissions and discharges from inpatient units are coordinated and authorized by the FDC Office of Mental Health Services in Tallahassee.  Some inmates requiring inpatient care may be transferred between institutions for treatment at three or more units over the course of a single inpatient stay.

16.     Deficiencies in care at even one inpatient unit can affect the quality of care provided to hundreds of inmates throughout the FDC system and can significantly impact an inmate's ability to recover and return to a more normal, less segregated, prison setting.

17.     FDC operates three levels of inpatient mental health care: Transitional Care Unit (TCU), Crisis Stabilization Unit (CSU), and Mental Health Treatment Facility (MHTF).

18.     These units are housed in buildings that are segregated from the general prison population.

19.     The TCU level of care is intended by FDC to provide psychiatric and psychological treatment in a structured residential setting. This level of care is designated to inmates who have significant impairments due to serious chronic or residual mental illness. According to FDC, the TCU level of care is supposed to include traditional mental health treatments such as group and individual therapy, activity therapy, recreational therapy and psychotropic medications in the context of a structured residential setting. TCU beds are available at all ten inpatient mental health institutions.

20.     The CSU level of care is intended by FDC to provide brief but intensive psychiatric and psychological care in a highly structured setting. The CSU level of care is designated for inmates who are experiencing acute emotional distress and who cannot be adequately treated in a TCU or infirmary isolation room. CSU admission criteria requires that inmates have significant mental impairments that require intensive psychiatric and psychological mental health care and treatment in a highly structured setting. This level of care is supposed to include a broad range of evaluation and intensive treatment devoted to rapid stabilization of acute symptoms and conditions of mental illness. CSU beds are available at all ten inpatient mental health units.

21.     The MHTF level of care is intended by FDC to provide extended treatment or hospital-level psychiatric or psychological care for inmates with acute or chronic mental impairments that interfere with their ability to correctly perceive or interpret reality and exercise control over their actions. Admission to MHTF requires a court order from a state circuit court finding that the inmate is mentally ill and demonstrating a refusal to care for himself or herself that poses a real and present threat of substantial harm to his or her well-being; or there is a substantial likelihood

6

that in the near future the inmate will inflict serious bodily harm on himself or herself or another

person, as evidenced by recent behavior causing, attempting, or threatening such harm.  The

MHTF represents what is supposed to be the highest level of therapeutic intervention for an

inmate with mental illness.   Inmates admitted to a MHTF are supposed to receive the most

intensive mental health care in the most structured environment in the FDC.

22.      MHTF beds are available at Lake CI and Suwannee CI for men and at the Florida

Women's Reception Center for women.

23.      The FDC contracts with a private vendor, Centurion of Florida, LLC (Contractor), to

provide mental health and medical services in its inpatient mental health units.

24.      The FDC has written policies called "Health Services Bulletins" (HSBs) that set out

standards for the provision of inpatient mental health care.

25.      The Contractor is contractually obligated to follow these HSBs in their operation of the

inpatient units. The FDC monitors the Contractor's compliance with the HSBs and other aspects

of the contracts through periodic monitoring of the inpatient units.

26.      The HSBs require that inmates admitted to inpatient mental health services receive a

timely psychological and psychiatric assessment upon admission to determine his or her mental

health needs.

27.      The HSBs require the development of Individualized Service Plans (ISPs) for each

inmate admitted for inpatient services.  The ISP is supposed to identify the inmate's mental

health diagnoses and problems, the inmate's goals, and the individualized care and treatment

needed to achieve the goals.  The ISP is also supposed to monitor the progress of the treatment

toward the identified goals.

28.     The HSBs require that inpatient treatment must include out-of-cell therapeutic services. The ISPs must include out-of-cell structured therapeutic care and treatment specific to the inmate to target a specific problem in the ISP. For TCU and CSU inmates, 12 hours of out-of-cell structured therapeutic services per week is required. For MHTF inmates, 15 hours of out-of-cell structured therapeutic services per week is required. Such services must actually be therapeutic and the required hours are meant to act as a minimum rather than a maximum.

29.     The HSBs require that inmates on psychotropic medications must be monitored for the mental, behavioral, and physical health effects of the medication and its side effects. Multiple psychotropic medications for individual inmates must be authorized and monitored by qualified mental and health care staff and psychiatric care must be provided over the course of the psychotropic medication treatment.

30.     The HSBs also address the procedure and criteria for use of psychiatric restraints on inpatient units.

31.     HSBs acknowledge that inmates discharged from an inpatient unit will need follow up mental health care to prevent decompensation and the need for readmission to inpatient services. Accordingly, each inmate is to have a discharge plan for the provision of mental health services on an outpatient basis.

32.     The FDC and its Contractor understand that the mental health services required by the HSBs are the minimum necessary to alleviate the disabling symptoms of the inmates' mental illness.

33.     The FDC has been aware for more than four years that there is massive widespread non-compliance with critical aspects of the HSBs governing the inpatient units. This situation continues in the inpatient units as of the filing of this Complaint.

34.     The FDC has been aware for more than four years that the care provided in a large majority, if not all, of its inpatient units is so inadequate that it violates the rights of inpatient inmates to adequate mental health care as guaranteed by the Eighth Amendment to the United States Constitution.

### The Defendants' Systemic Failure to Provide Adequate Mental Health Care

35.     Defendants were, and are, aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment provided throughout its inpatient mental health system, including:

36.     **Lack of treatment:**  Inmates receive a lack of meaningful treatment activity. Individual counseling is rare and when it does occur it is often little more than a status check at an inmate's cell door.  Group therapy is infrequent and when it does take place, it usually lacks any meaningful content and has little or no direct relationship to the inmate's actual problems or his individual service plans. Inmates denied adequate treatment languish for years on inpatient units, either regressing or making no progress toward recovery. Their treatment plans go for months or years with no significant change.

37.     **Lack of meaningful ISPs:**  Most service plans are "cookie-cutter" plans that list identical interventions regardless of the inmate's symptoms or needs. In addition, ISPs are rarely amended or changed if the inmate is not making progress or if the inmate's needs change.

38.     **Excessive isolation and segregation:**  Absent appropriate treatment, assignment to an inpatient unit amounts to little more than prolonged isolation similar to disciplinary confinement or close management. Inpatient inmates, especially those confined on the inpatient units at Suwannee CI, Charlotte CI, FWRC and Santa Rosa CI - Annex, are locked in small single-person cells. For a majority of the week they spend 24 hours a day confined in their cells.  The

lack of individualized risk assessments at the institutions further exacerbates the use of confinement and lack of any personal interaction. They have limited out-of-cell activities, are restricted to outdoor exercise in small solitary cages, and their access to programs such as visitation, religious services, reading material, and other privileges are highly restricted. These harsh conditions often exacerbate the symptoms of mental illness and prolong their confinement in inpatient units.

39.     **Lack of basic primary medical care and coordination between psychiatric and medical providers:**  Multiple inpatient inmate medical records indicate a lack of required physical exams. Vital signs and weights are not recorded as required. In addition, required nursing assessments are frequently missing. Records often have incomplete or inaccurate Medication Administration Records. There is a lack of required laboratory exams and follow-ups. There is frequently no communication or collaboration between the mental health staff and the medical staff which adversely affects the medical as well as mental health care of the patients.

40.     **Inpatient units lack sufficient numbers of qualified clinical staff:**  Many inpatient units rely on a single psychiatrist when two or more are required. In addition, many inpatient units are forced to rely on a *locum tenens* psychiatrist, which severely undermines the timeliness, quality, and continuity of care provided to the inmates. FDC has been made aware on multiple occasions through its contract monitoring and through reports from organizations such as the Correctional Medical Authority ("CMA") that many of the inpatient units are critically understaffed—especially professional staff. In addition, none of the inpatient units have professional mental health staff available for treatment or mental health emergencies on any of the inpatient units after 5:00 PM.

41.     **Inpatient units lack sufficient numbers of security staff:**  Many inpatient mental health units lack sufficient numbers of security staff necessary for appropriate supervision and escort of the inmates to various treatment activities. Often treatment activities must be canceled as a result of a lack of appropriate security staff to escort and supervise inmates.

42.     **Inadequate supervision on SHOS:**  Inpatient units provide inadequate supervision of inmates who have attempted or threatened self-harm and have been placed in self-harm observation status (SHOS). In several instances inmates in SHOS have died as a result of the lack of appropriate supervision.  Further, the FDC has not taken action in these cases to correct known deficiencies.

43.     **Lack of treatment for SIB:**  There is a lack of specialized behavioral treatments for individuals who engage in self-injurious behavior (SIB) due to mental illness. A significant number of inmates housed in inpatient mental health units engage in multiple instances of self-injurious behavior due to their mental illness. The FDC fails to provide appropriate assessments for the causes of SIB and fails to provide specialized therapeutic treatment programs for addressing SIB.

44.     **Inappropriate treatment settings:**  Several inpatient mental health units, including but not limited to Union CI and Suwannee CI, lack appropriate treatment settings. Units lack physical space to conduct appropriate group or individual counseling. Inmates wishing to participate in therapeutic activities are required to sit in outdoor "cages" at the inpatient mental health units in Union CI and Santa Rosa CI - Annex. At Suwannee CI, inmates desiring to participate in group therapy are placed in a locked room while the therapist speaks to them from a different room over a microphone. At several inpatient mental health units, individual

11

"therapy" takes place at the inmate's cell with the inmate and the counselor attempting to communicate through a solid door.  These sessions are usually brief and ineffective.

45.     **Lack of discharge planning for follow-up mental health care:**  Inmates discharged from inpatient mental health units are not provided with appropriate discharge plans for follow-up mental health care. Many inpatient inmates are discharged directly to solitary confinement where they receive little or no follow-up mental health care. Many of these inmates quickly decompensate resulting in a new cycle of inpatient admission.

46.     **Inappropriate use of involuntary medication and restraints:**  FDC does not enforce standardized criteria for the use of force to involuntarily medicate inpatient inmates. FDC fails to enforce standardized criteria for the use of physical restraints on inpatient inmates. As a result, forcible treatment orders and physical restraints are prone to misuse and arbitrary application. In addition, the FDC does not enforce standardized criteria for the use of physical force to require compliance with treatment orders. The result is that uses of force on inpatient units greatly exceed uses of force in all other areas of the prison population, including for those inmates placed in confinement statuses such as disciplinary confinement or close management.

47.     **Disciplinary punishment for behavior caused by mental illness:**  The FDC fails to enforce its own policy for mental health review of disciplinary reports issued to inmates on inpatient mental health units. Mental health officials are required to evaluate disciplinary reports issued to any inmate on an inpatient unit and provide input to the discipline hearing team on how an inmate's behavior may have been influenced by his or her mental illness. FDC is aware that this requirement is routinely ignored on inpatient units.  As a result, inmates are often punished for behaviors that are a direct manifestation of their mental illness. This results in a further restriction of privileges and often extends the duration of their placement on the inpatient unit.

FDC is also aware that many inmates on inpatient units cannot utilize FDC procedures to challenge these disciplinary actions because of their mental illness.

48.      **Lack of appropriate oversight, investigation and quality management:**  The FDC has no system to identify and correct systemic deficiencies in the quality of care in the inpatient mental health units.  The contractor has failed to provide constitutionally adequate care in terms of quality or quantity and the FDC has not taken meaningful action to correct the situation.  In instances involving serious abuse or death of inmates on inpatient mental health units, investigations drag on for years with no meaningful action.  The FDC has no system to identify or remove mental health practitioners who are providing constitutionally inadequate care.

**Examples of Defendants' Constitutional Violations**
**Against Plaintiff's Client and Constituents**

**John Doe #1**[1]

49.      John Doe #1 had been incarcerated in the FDC since 2013.  John Doe #1 was scheduled to be released from incarceration in July 2017.  He died while housed on the inpatient mental health unit at Union CI in late 2015.

50.      John Doe #1 had a long history of serious mental illness.  He was diagnosed with Schizophrenia.  During a previous incarceration in FDC, John Doe #1 had several lengthy admissions to FDC inpatient units. In fact, he was released from an inpatient unit to the street when his previous sentence expired in 2010.

51.      After being charged in his most recent offense, the court determined him to be incompetent to stand trial and ordered him to be admitted to a state hospital for competency restoration.

---

[1] Pseudonyms are used here to protect the inmates' confidential medical and mental health information. The identities of John and Jane Does will be provided to the Defendants once a protective order is in place to safeguard the confidentially of their information.

13

52.     During his recent and final incarceration in FDC, John Doe #1 had been housed nearly continuously on FDC inpatient mental health units since March 2014.

53.     In 2015, John Doe #1 was in and out of the TCU and CSU for mood shifts and difficulty attending to daily needs such as personal hygiene.  His ISPs include problem codes for mood swings, hallucinations, thought disorder and resistance to treatment.  He was prescribed Tegretol to help manage these issues.

54.     From April 2015 until the date of his death, John Doe #1 refused almost every psychiatric appointment, group session, individual counseling session or other activity offered to him.  His refusals were directly related to his mental illness.  John Doe #1 was spending nearly 24 hours a day, seven days a week in his cell.  He was unkempt and neglecting his hygiene.  He was noted to be smearing feces in his cell.  He often refused to eat.

55.     Security and mental health staff routinely noted there were "no behaviors or appearance of concern" but they were "unable to assess his progress toward treatment goals" because of his refusal to participate in any activities.

56.     Additionally, during this same time period, John Doe #1's lab results indicated "critically low" blood sodium levels.  Low blood sodium levels, also known as hyponatremia, can be a side effect of Tegretol and if left uncorrected can be fatal.

57.     Six weeks before his death, the psychiatrist discontinued the Tegretol.  However, no other labs or follow up occurred to monitor the blood sodium levels.  Additionally, John Doe #1 was not prescribed a replacement psychotropic after the Tegretol was discontinued.  The medical and mental health staff failed to appropriately follow up or address this serious medical need.  On the day before John Doe #1's death, the psychiatrist ordered labs because "no follow up sodium levels" had ever been completed.

14

58.    The next day, John Doe #1 was found dead in his cell. Institutional medical records indicate John Doe #1 was non-responsive and the institution's doctor described John Doe #1 as having "poor hygiene, severe dehydration, cachectic looking."

59.    Prison medical staff initiated resuscitation efforts but the autopsy determined that John Doe #1 had been deceased for some time with rigor mortis setting in before paramedics arrived at the institution.

60.    An autopsy listed the cause of John Doe #1's death to be "undetermined."

61.    However, the medical examiner described John Doe #1 as "malnourished" and the autopsy findings determined John Doe #1 was suffering from "malnutrition" at the time of his death.

62.    The FDC listed John Doe #1's height and weight as 5'9" and 175 pounds at the time of his incarceration.  The autopsy states that at the time of his death he weighed just 115 pounds. This dramatic drop in weight was not caused by any physical illness or disease.

63.    The autopsy findings also found John Doe #1 to be in a general unwashed condition with feces on his body.

64.    John Doe #1's autopsy findings suggest that he was subjected to abuse and neglect while housed in the inpatient mental health unit before his death.

65.    Medical and mental health staff failed to intervene as John Doe #1 repeatedly refused to eat, wash, or care for himself. These failures placed John Doe #1 at a significant risk of harm and ultimately resulted in his death.  Staff allowed John Doe #1, who was actively diagnosed as treatment resistant and had been refusing all treatment for months, to refuse himself to death.

66.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Union CI and they have failed to take reasonable

15

measures to address it.  Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Union CI through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it.

**John Doe #2**

67.     John Doe #2 entered FDC in 2006.  During his incarceration he had an extensive inpatient history with a number of serious self-inflicted injuries.  He has served nearly all of his FDC incarceration in inpatient mental health units which is where he ultimately died.

68.     John Doe #2 began receiving mental health treatment in the community at the age of 18 when he was involuntarily committed under Florida's Baker Act.  Throughout the years prior to incarceration, he received outpatient treatment at well as residential treatment.   His diagnosis was Major Depressive Disorder with Psychotic Features.

69.     In September 2013, John Doe #2 was admitted to the inpatient unit at Charlotte CI after he bit through an artery on his arm.  After a few months on the inpatient unit, he was discharged to an outpatient setting in February 2014 and transferred to Martin CI.

70.     Mental health staff at Charlotte CI did not develop a discharge plan for dealing with John Doe #2's self-injurious behavior on an outpatient basis as required by FDC policy.

71.     John Doe #2 was at Martin CI for less than three months when he severely injured himself by biting through a vein in his wrist. He was placed in a Self-Harm Observation Status (SHOS) cell at Martin CI and referred to an inpatient mental health unit.

72.     John Doe #2 was transferred back to Charlotte CI and placed in the CSU. When he arrived, John Doe #2 met with staff who noted that he "[d]enies suicidal thoughts at this time but states he intends to hang himself."

16

73.     Over the next few weeks, staff noted that John Doe #2 continued to state an intention to harm himself.  Staff noted, however, that John Doe #2 "appears to be exaggerating symptoms."

74.     Two weeks later, John Doe #2 was discovered in his inpatient cell with a shirt tied around his neck in an attempt to hang himself.  At approximately 8:55 p.m., a nurse informed security of John Doe #2's attempt to hang himself. Charlotte CI has no regular mental health staff present on the inpatient mental health unit after 5:00 p.m.  Because this incident occurred in the evening there was no mental health staff available to intervene, the only medical staff on the inpatient unit was licensed practical nurses (LPNs) without any specialized training to work on the inpatient mental health unit.

75.     At approximately 9:00 p.m., one of the LPN nurses contacted the institution's psychiatrist by telephone who authorized the use of force to stop John Doe #2's behavior and to place him on SHOS.  The psychiatrist also authorized an emergency treatment order (ETO) for an injection of Ativan.

76.     At approximately 9:36 p.m., security gave John Doe #2 a final order to stand up and submit to hand cuffing.  When John Doe #2 did not comply with this order a "cell extraction team" consisting of four correctional officers entered his cell, forced him to the floor and placed him in hand, arm and leg restraints.  John Doe #2 suffered significant injuries to his face and mouth during the extraction.

77.     John Doe #2 was removed from his cell and forcibly placed in a SHOS shroud. During this process, John Doe #2 was attempting to spit on the officers.  He was placed in a "spit shield" which is a type of hood that covers the lower part of an inmate's face, including his mouth.

17

78.     John Doe #2 was then forcibly carried back to his cell where a nurse administered the injection of Ativan. The officers removed the restraints and exited his cell. The spit shield was not removed.

79.     The psychiatrist's order placing John Doe #2 on SHOS status also required 15-minute checks.

80.     The 15-minute observations are recorded by staff writing their initials on a checklist. Between the observations there is no requirement that staff remain in close proximity to the cell. In addition, there is no assurance that the observations are actually done in a timely manner or that observations are anything more than a cursory glance.

81.     John Doe #2 was never evaluated by medical staff other than the LPN after the use of force prior to the ETO or prior to his placement back in the cell.

82.     The psychiatrist ordering the ETO was not informed that John Doe #2 was in a spit shield and was bleeding from injuries to his face and mouth. This was critical information because one of the known cautions regarding the use of Ativan is that it can cause respiratory distress.

83.     FDC policy, consistent with most policies around the nation, requires that any inmate placed in a spit shield be continuously monitored for respiratory distress.

84.     FDC policy, consistent with most policies around the nation, precludes use of the spit shield on an individual who is bleeding from the nose or mouth area.

85.     Correctional and medical staff at Charlotte CI violated both of these policies in their treatment of John Doe #2.

86.     Approximately 20 minutes after John Doe #2 was placed back in his cell and given the ETO, the nurse conducting a cell front check was not able to determine whether or not John Doe

#2 was breathing.  The cell extraction team returned to the cell to accompany the nurse for a wellness check.  John Doe #2 was not breathing and the nurse started CPR.

87.     John Doe #2 was transferred to Lee County Hospital where he was pronounced dead.

88.     An autopsy was conducted the next day and the manner of death was listed as "Homicide."  Specifically, John Doe #2's death was due to "Complications of asphyxia; Hemoaspiration [inhalation of blood] associated with blunt traumatic injuries of oral cavity & obstruction of airways by spit shield."

89.     John Doe #2 was placed on the inpatient mental health unit at Charlotte CI in 2014 to protect him from self-harm caused by his known mental illness.  However, the sequence of events from his admission to his death illustrates gross deficiencies in treatment and supervision of inmates on the inpatient mental health unit.

90.      Inpatient mental health unit staff failed to adequately treat John Doe #2 through individualized or appropriately specialized treatment for individuals who engage in self-injurious behavior due to mental illness.  Additionally, there was no trained mental health staff available on the inpatient mental health unit to try to deal with John Doe #2's apparent suicide attempt.  As a result, the psychiatrist and security staff resorted to a use of force to cope with a mental health issue which caused additional injury to John Doe #2.

91.     Clinical and correctional staff were either unaware of or ignored FDC's own policies regarding the use of the spit shield.  Clinical staff failed to adequately assess John Doe #2's injuries and the appropriateness of use of the spit shield.  Clinical staff failed to apprise the on-call psychiatrist of critical information relevant to the decision to issue the ETO for Ativan to John Doe #2. Clinical staff failed to appropriately monitor John Doe #2 for signs of respiratory or other distress immediately after the administration of the ETO. The instances of gross

19

negligence and direct violations of FDC policy were the proximate cause of John Doe #2's death on the inpatient unit.

92.     Florida Department of Law Enforcement (FDLE) and the FDC conducted an investigation into the circumstances of John Doe #2's death.  They concluded that no criminal intent was associated with John Doe #2's death and closed the investigation.

93.     In 2015, the FDC Inspector General opened an "administrative investigation" into the circumstance of John Doe #2's death.

94.     More than two years after John Doe #2's death the investigation remains "open" and no disciplinary or corrective action has been taken by FDC against correctional or medical staff. Medical staff involved in John Doe #2's death continue working in the Charlotte CI inpatient mental health unit.

95.     Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Charlotte CI and they have failed to take reasonable measures to address it.  Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Charlotte CI through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it.  Further, the failure to provide John Doe #2 with any meaningful treatment for individuals who engaged in self-injurious behavior due to mental illness placed John Doe #2 at a significant risk of harm which ultimately resulted in his death.

**John Doe #3**

96.     John Doe #3 had been incarcerated in the FDC since May 2007. He died while housed on the inpatient mental health unit at Charlotte CI in 2015.

97.     Since his incarceration, John Doe #3 had numerous inpatient hospitalizations, all of which were prompted by self-harm or threats of self-harm.  John Doe #3 was diagnosed with depression and antisocial personality disorder.

98.     In May 2015, John Doe #3 was housed in the general population at Charlotte CI where his mental illness was to be treated on an outpatient basis.  The following month, John Doe #3 received disciplinary reports for lying to staff, missing count and being in an unauthorized area. He was placed in disciplinary confinement. In spite of his history of serious mental health issues and self-injurious behavior, he was cleared by mental health staff for confinement housing with no restrictions or cautions.

99.     A few months later, at 2:30 a.m., an officer heard banging coming from John Doe #3's disciplinary confinement cell.  The officer found John Doe #3 cutting his left arm with an unknown object. The officer ordered him to stop and gassed him with chemical agents.

100.    John Doe #3 had seriously injured his arm from the cutting with significant loss of blood. He was taken to the prison infirmary for treatment of his wound. Because Charlotte CI had no mental health staff present at the institution at night he was not seen by a psychiatrist or psychologist.  Instead, an LPN on duty received a telephone order from an advanced registered nurse practitioner (ARNP) authorizing John Doe #3 to be placed in an Isolation Management Room/Self Harm Observation Status (IMR/SHOS) with 15-minute checks.

101.    The LPN also requested an urgent mental health referral for John Doe #3.

102.    John Doe #3 was placed in an IMR cell on Charlotte CI's inpatient mental health unit. He was to be observed by staff every 15 minutes.

103.    The 15-minute observations are recorded by staff writing their initials on a checklist. Between the observations there is no requirement that staff remain in close proximity to the cell.

In addition, there is no assurance that the observations are actually done in a timely manner or that observations are anything more than a cursory glance. Clinicians also have the option to order more frequent or continuous observation of inmates in SHOS.

104.    John Doe #3 was seen the next morning at his cell by a mental health counselor who noted that John Doe #3 stated that he still intended to harm himself. In spite of this, John Doe #3 was not seen by a psychiatrist or psychologist and there is no indication that a psychiatrist or psychologist reviewed his records. There was no other mental health treatment or intervention attempted for John Doe #3 other than the single visit by the counselor. He remained on IMR/SHOS on the inpatient mental health unit with 15-minute observations on the inpatient unit.

105.    At 7:40 p.m., the housing Sergeant during his routine rounds (not the 15-minute checks) found John Doe #3 bleeding from his left arm while lying on his bunk in the IMR. A large amount of blood was on the cell floor. John Doe #3 had used a paint chip to re-open his previous injury to his arm.

106.    At 7:57 p.m., three officers entered John Doe #3's cell and transported him on a gurney to the facility's institutional emergency room. John Doe #3 received treatment for his injury and he was returned to the IMR.

107.    No mental health staff was informed of John Doe #3's second instance of self-injury. There was no change to his 15-minute observation status.

108.    The following morning, at 5:10 a.m., an officer conducting a routine security check saw John Doe #3 in his cell lying on the floor and he appeared to be unresponsive. The officer notified the LPN assigned to the unit who then conducted a cell front observation. The LPN did not enter John Doe #3's cell and no attempt was made to try to rouse him. The LPN dismissed

the officer's concern and stated that he "could see [John Doe #3's] stomach rise and fall." No other effort was made at that time to determine John Doe #3's well-being.

109.    Twenty minutes later, a different officer looked into John Doe #3's cell and saw him "lying on the floor with no clothes on his back. He seemed unresponsive and could not clearly see his chest or stomach rising or falling." The officer called the LPN and several other security staff to the cell. Ten minutes later, they entered the cell and could not find a pulse. CPR was initiated. John Doe #3 was pronounced dead at 6:15 a.m.

110.    The Charlotte County Medical Examiner determined that John Doe #3 died due to blood loss from self-inflicted cuts on his left arm and classified the manner of death as a suicide.

111.    Inmates placed on IMR/SHOS are placed in particular cells that have had all items with which an inmate could harm himself removed. It is fundamental that these cells be in good repair and condition. Even relatively minor items such as peeling paint can be used by a suicidal inmate to harm himself.

112.    The CMA conducted an inspection of Charlotte CI in April of 2015 – prior to John Doe #3's death. The CMA found many deficiencies in the inpatient mental health unit. One specific finding was that paint was peeling from the IMR cells on the inpatient mental health unit. In addition, the CMA found that in 6 of 15 SHOS admissions the documentation did not indicate that the inmate was observed at the frequency ordered by the clinician. The institution and the FDC was notified of these deficiencies in a written report on April 27, 2015 and the FDC was to have a corrective action plan developed by May 27, 2015 well before John Doe #3's death.

113.    The deficiency regarding the condition of the IMRs had not been corrected at the time John Doe #3 was placed in the IMR in August. The deficiencies regarding IMRs and the observation of SHOS inmates were still not corrected at the time of a CMA follow-up visit to

23

assess implementation of the corrective action plan in late October 2015. The CMA was never informed of John Doe #3's death in an IMR during their corrective action plan follow-up visits.

114.    More than a year after John Doe #3's death, the FDC's investigation of his death is listed as "pending." There has been no determination on how John Doe #3 managed to kill himself while allegedly under close observation on SHOS. To date, no remedial action has been taken by FDC.

115.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Charlotte CI and they have failed to take reasonable measures to address it. Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness and the dangerous conditions of the IMR/SHOS cells at Charlotte CI through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to correct them. Further, the failure to provide John Doe #3 with any meaningful treatment for individuals who engage in self-injurious behavior due to mental illness, the failure to provide John Doe #3 with a safe and secure cell and the failure to observe John Doe #3 at the frequency ordered by the clinician placed John Doe #3 at a significant risk of harm which ultimately resulted in his death.

**John Doe #4**

116.    John Doe #4 has been incarcerated in the FDC since December 2005. He is serving a life sentence. John Doe #4 is presently confined in the inpatient unit at Dade CI.

117.    John Doe #4 has a current diagnosis of schizoaffective disorder. He has also been diagnosed in the FDC as "schizophrenia unspecified."

118.    Between 2009 and 2010, John Doe #4 routinely cycled between confinement and inpatient mental health units in the FDC.

24

119.    In the few instances he was discharged from an inpatient mental health unit, he was placed in solitary disciplinary confinement or close management confinement where he received little or no comprehensive mental health follow-up care.  In each instance, he quickly decompensated and had to be returned to the inpatient mental health unit.

120.    Since March of 2011, John Doe #4 has been on inpatient units nearly continuously. He has been confined on inpatient mental health units at Union CI and Lake CI. His only discharge from the inpatient unit was to disciplinary solitary confinement for about four months in 2013. Again, John Doe #4 received little or no comprehensive mental health follow-up care and his mental state decompensated resulting in a return to the inpatient mental health unit.

121.    Since 2012, John Doe #4 has had multiple MHTF admissions. A psychiatrist's summary prior to a transfer from Union CI to the MHTF unit at Lake CI in early 2015 states: "inmate is delusional, believes he is God, refusing meds and treatment, not eating all meals. Will likely need MHTF for stabilization due to chronic refusal."

122.    John Doe #4's ISP identifies his resistance to treatment as a problem to be addressed by his treatment plan.  However, the interventions listed in his ISP to address this problem are identical to every other inmate on the inpatient unit regardless of whether they are treatment resistant or not.  His inpatient progress notes contain no indication that John Doe #4's treatment resistance is being addressed.

123.    John Doe #4's ISP indicates that he is currently delusional and is refusing all treatment and therapy sessions. John Doe #4 is spending nearly 24 hours a day each day in his cell.  There is no indication in his clinical records that the treatment staff is making any effort to engage him in treatment activities. Other than the interventions listed in the ISP, the notes do not include any plan or recommendations on how to engage John Doe #4 in therapeutic activities.

25

124.    John Doe #4 is scheduled to receive group three times per week for a total of six hours, case management once per week, individual counseling once per week, activity therapy four hours per week and therapeutic community once per week for a total of at least 12 hours per week.  Instead, John Doe #4 is offered, on average, less than half of those hours.  Two of those hours offered are spent simply watching television.  The records indicate the reason for offering less than half the required hours is shortage of security staff.  The cancelation of treatment activities due to lack of security staff has been a chronic problem in the Union CI inpatient mental health units.

125.    John Doe #4 sees a psychiatrist less than once a month.  These visits are brief, usually less than 10 minutes, and the doctor speaks to John Doe #4 cell front through the solid cell door.

126.    John Doe #4 is receiving grossly inadequate treatment for his mental illness.  Not surprisingly, a recent treatment note indicated John Doe #4 is "making no progress toward his treatment goals."  If he continues on his current course he will (as he has in the past) require re-admission to the MHTF for "stabilization." This will extend his continued segregation and confinement in FDC inpatient units.

127.    John Doe #4 has not received a disciplinary report since September 2013.  His behavioral risk assessment places him in the mild or lowest risk category.

128.    In spite of this low risk, his movement on the inpatient unit is highly restricted and he is placed in handcuffs any time he is taken out of his cell for any reason, including any therapeutic or recreational activity. His privileges and living conditions on the inpatient unit are essentially equivalent to long-term solitary confinement.

129.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at the Union CI and Lake CI and they have failed to

26

take reasonable measures to address it. Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Union CI and Lake CI through CMA and FDC's own monitoring reports and other sources and they have failed to take prompt action to stop it. Further, the failure to provide John Doe #4 with any meaningful treatment to address his delusions or his refusal to attend treatment and therapy sessions places him at a continued risk of harm.

**John Doe #5**

130.    John Doe #5 has been incarcerated in the FDC since November 2006. He is serving a 30-year sentence. John Doe #5 is presently confined in the MHTF at Lake CI.

131.    John Doe #5 has a diagnosis of schizoaffective disorder and bipolar disorder.

132.    Since May 2013, John Doe #5 has been confined continuously in FDC inpatient mental health units. From May to November 2013, he was confined at the Suwannee CI unit. In November 2013, he was transferred to the inpatient mental health unit at Union CI where he remained for four months until his mental status deteriorated to the point that he was admitted to the MHTF at Lake CI in March 2014.

133.    John Doe #5 was confined at Lake for two months. In May 2014, clinicians at Lake CI believed he was stable enough to be discharged to the TCU at Suwannee CI. He remained at Suwannee for eight months until he again decompensated to the point that he was again admitted to the MHTF at Lake CI where he remained for six weeks.

134.    Lake CI again discharged John Doe #5 to the inpatient mental health unit at Santa Rosa CI - Annex in March 2015. He remained at Santa Rosa CI - Annex for only two months before he decompensated and was readmitted to the MHTF at Lake CI in May 2015.

27

135.    Between May 2015 and November 2015, John Doe #5 was housed on MHTF level of care at Lake CI.

136.    Treatment and medication compliance was and is a long-standing issue with John Doe #5 and was directly related to his mental illness. While at Lake CI, John Doe #5 was treated with Risperdal Consta, a long-action injectable form of the psychotropic medication Risperidone that is effective and often used for individuals who may be noncompliant with medication.

137.    John Doe #5 was stabilized and discharged from MHTF. He was transferred to the TCU at Union CI in November 2015. Upon arrival at Union CI inpatient unit, a few days after his transfer, a psychiatrist found him to be lucid and stable on his medication. The psychiatrist noted however that Risperdal Consta was "not available" at Union CI. Instead, he was placed on a daily dose of Risperdal a medication regimen that had been unsuccessful with John Doe #5 in the past. The psychiatrist note indicates that John Doe #5 would receive a follow-up in 14 days. That follow-up never happened.

138.    Over the next three months, John Doe #5 received virtually no treatment for his mental illness. His records indicate that, in November and December 2015 and January 2016, nearly all of the individual counseling sessions with mental health professionals for John Doe #5 were canceled as a result of the lack of security staff at the Union CI inpatient mental health unit. The only notes by mental health professionals in John Doe #5's record during this time indicate that they were "unable to assess" him or that his current functioning could "not be determined."

139.    On February 1, 2016, during a search of John Doe #5's cell, security found multiple doses of his medication. Staff determined that he had been hoarding his medications.

140.    John Doe #5 was finally seen by a psychiatrist on February 3, 2016. He had gone three months without seeing a psychologist or psychiatrist. By that time John Doe #5's mental status

28

had significantly deteriorated. He was found to be "disheveled," "unkempt" and "actively responding to internal stimuli." The psychiatrist recommended his transfer to the CSU on that date.

141.    John Doe #5's psychiatrist made two more recommendations for a transfer to the higher level of CSU care on February 18 and February 29, 2016. A note by a psychiatrist on February 29th indicated that John Doe #5 was "in need of immediate transfer to CSU level of care." John Doe #5 was not transferred to a CSU level of care until March 16, 2016. In the interim six weeks between the initial referral to a higher level of care on February 3rd and his transfer on March 16, John Doe #5's condition and mental status continued to decline.

142.    When John Doe #5 was finally transferred to CSU level of care at Union CI, his condition had deteriorated to the point that the psychiatrist filed a petition seeking court order for his admission to MHTF level of care at Lake CI.

143.    On April 14, 2016, the state circuit court issued an order directing John Doe #5's admission to MHTF level of care. John Doe #5 was admitted to the MHTF level of care at Lake CI for the fourth time in two years. John Doe #5 remains at Lake CI at this time.

144.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Suwannee CI, Union CI, Santa Rosa CI - Annex and Lake CI and the have failed to take reasonable measures to address it. Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Suwannee CI, Union CI, Santa Rosa CI - Annex and Lake CI through the CMA and FDC's own monitoring and other sources and they have filed to take prompt action to stop it. Further, the failure to provide John Doe #5 with any meaningful treatment to address his

deteriorated mental status or his refusal to take medication places him at a continued risk of harm.

**Jane Doe #6**

145.    Jane Doe #6 has been incarcerated in the FDC since 2009. Jane Doe #6 was in and out of inpatient mental health care from 2009 to 2011. Since 2011, Jane Doe #6 has consistently been housed in an inpatient mental health unit. Jane Doe #6 is currently confined in the Florida Women's Reception Center (FWRC) inpatient unit.

146.    Jane Doe #6 has been diagnosed with Schizoaffective Disorder and Borderline Personality Disorder. Jane Doe #6 has cycled between the TCU and CSU levels of care.

147.    Jane Doe #6 has a long history of exhibiting behaviors caused by her mental illness including experiencing auditory hallucinations, screaming out at random moments, engaging in loud arguments with people who are not there during psychotic episodes, not taking showers, refusing medications and refusing meals.

148.    In January 2016, Jane Doe #6 was confined in the TCU at FWRC. A psychologist requested a transfer to the CSU level of care because Jane Doe #6 had engaged in self-injurious behavior by head banging in her cell, was refusing medication, was "psychotic and delusional" and was "decompensating" and required a higher level of mental health care.

149.    In March 2016, after Jane Doe #6 spent six weeks waiting in the TCU for a bed in the higher level of care, the FDC Office of Mental Health finally approved the transfer request.

150.    Jane Doe #6's ISPs developed in the CSU identify hallucinations and resistance to treatment as her two problem codes and outline treatment interventions.

151.    Some of Jane Doe #6's treatment plans note that she "will identify and implement two coping skills for symptom reduction" and "demonstrate compliance with treatment and therapy."

However, the treatment notes contain no indication that this treatment activity was actually carried out or attempted. There is no mention in the treatment notes of what coping skills Jane Doe #6 should use, how she would learn those coping skills, or what progress, if any, Jane Doe #6 has made towards learning or utilizing the coping skills.

152.     For the six months that these plans were in effect, the notes indicate "unsatisfactory" progress toward treatment goals and "unsatisfactory" medication compliance. Most weeks Jane Doe #6 was not participating in any groups or recreation and she is often not medication compliant.

153.     During this same time, Jane Doe #6 has engaged in at least two serious acts of self-injury including punching herself in the face and banging her head in her cell to the point that she was bleeding, required medical attention and required ETOs.  These events are not addressed in her treatment plans or treatment interventions.

154.     The inpatient mental health staff has not engaged in any treatment activities to address Jane Doe #6's behavior and underlying personality disorder.  Although she has made no progress, her ISPs have looked virtually identical for every month she has been in the CSU.

155.     Although Jane Doe #6 was housed on an inpatient mental health unit, she received multiple disciplinary reports (DRs) and the psychiatrist never once determined that Jane Doe #6's mental health contributed to her actions.

156.     One such incident occurred when Jane Doe #6 received a DR for "unauthorized physical touching" because she tried to remove her wrist from psychiatrist-ordered five-point psychiatric restraints.  The five-point restraints were ordered by a psychiatrist because Jane Doe #6 was in the midst of an acute mental health crisis in the CSU.  There was no finding by any staff that Jane Doe #6's mental health contributed to her actions.

31

157.    Jane Doe #6 received another DR for "failure to maintain personal hygiene" on the inpatient mental health unit because she was not coming out of her cell to take showers. This is a common manifestation for people with serious mental illness on an inpatient mental health unit.

158.    The psychiatrist determined there was no reason to believe Jane Doe #6's mental health impaired her ability to make decisions about leaving her cell to shower. Jane Doe #6 was found guilty of the DR and was punished with ten days of disciplinary confinement. Remarkably, the failure to maintain personal hygiene was not addressed in Jane Doe #6's next ISP update.

159.    Jane Doe #6 also received multiple DRs in the inpatient mental health unit for "disobeying an order" because she was yelling uncontrollably and was unable to obey the correctional officers' orders to stop, for "disrespecting officials" for cursing at a correctional officer while in the midst of a mental health crisis and for "battery on a correctional officer" for tossing a small amount of juice out her food flap and onto a correctional officer because she was upset about her medication while housed in the CSU.

160.    In each of these DRs, the psychiatrist determined Jane Doe #6's mental illness in no way contributed to her behaviors.

161.    The FDC's HSBs state the CSU level of care is meant to be "relatively brief, typically less than two weeks." Jane Doe #6 has been in the CSU level of care for over six months. Jane Doe #6 continues to be non-compliant with medication and rarely participates in treatment. Jane Doe #6 is being harmed by the inadequate care being provided for the severity of her symptoms. The inadequate care prevents her from participating in activities and keeps her in solitary confinement conditions with limited privileges on the inpatient mental health unit longer than necessary.

32

162.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at FWRC and they have failed to take reasonable measures to address it.  Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at FWRC through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it.  Further, the failure to provide Jane Doe #6 with any meaningful treatment to address her serious mental health issues and related disciplinary issues place her at a continued risk of harm.

**John Doe #7**

163.    John Doe #7 has been incarcerated in FDC since 2011.  John Doe #7 had been in the MHTF level of care at Lake CI since September 2012.  He recently died on that unit. Autopsy results and case of death are pending.

164.    John Doe #7's records include a diagnosis of schizophrenia and history of thought disorder and mood swings.

165.    On July 22, 2016, the FDC filed its most recent request for a court order authorizing John Doe #7's continued placement in MHTF for another year.

166.    In the request to the court, the psychiatrist noted John Doe #7 "experiences auditory hallucinations, severely disorganized thoughts, bizarre behavior, talking to himself, poor hygiene, agitation, poor insight and poor judgment."  The psychiatrist also noted John Doe #7 "is known to defecate in his hands and immediately eat his own feces," "yells incoherently" from his cell, requires cell extractions for "forced hygiene," smashes his fists on the window of his cell which "resulted in chronic swelling of his hands" and stands for extended periods of time in his cell resulting in chronic swelling of his feet and ankles.

33

167.    John Doe #7's ISPs identify mood swings, resistance to treatment and thought disorder as his problems.  The interventions for each problem in his ISP are identical.  The interventions are also virtually identical to the interventions of many other inmates in MHTF regardless of their diagnoses or problem codes.

168.    The interventions for John Doe #7 include case management once per week, individual counseling once per week, group twice per week, and recreation twice per week.   His goals include "discussing methods of maintaining his mental ability" in each counseling session until January 2017, "learning coping skills" and "discussing the benefits of treatment" during each counseling session and only reporting thought disorder "three out of seven times per week" during a six-month period.

169.    These interventions are proposed for someone who eats his own feces, screams and yells in his cell and rarely, if ever, attends group therapy or recreation sessions during his four years in MHTF.  If he does attend individual counseling, it is only because individual counseling and case management are one in the same. This "attendance" occurs when the counselor stands outside John Doe #7's door and talks at him for 15 minutes once per week.

170.    John Doe #7's records indicate he attends therapy or receives treatment for less than one hour per week.  This has been the case for months, if not years.  The notes in John Doe #7's records indicate his symptoms remain "severe" and his "adjustment is poor," yet John Doe #7's ISPs have remained virtually unchanged since at least January 2014 with John Doe #7 making no progress at all in treatment.

171.    Prior to his death, John Doe #7 had neither made any progress toward his goals, nor participated in therapeutic activities in years.  If anything, he was regressing.  Little to no effort

was made to engage him in treatment. John Doe #7 remained in virtual solitary confinement with limited privileges as the result of the inadequate mental health care being provided to him.

172.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Lake CI. Their failure to take reasonable measures to address it contributed to John Doe #7's death. Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Lake CI through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it.

**John Doe #8**

173.    John Doe #8 has been incarcerated in the FDC since 2011. John Doe #8 is presently confined in the MHTF level of care at Lake CI.

174.    John Doe #8 has a long and documented history of mental illness while in the FDC. His diagnoses include paranoid schizophrenia with a history of acute psychosis and suicidal tendencies. John Doe #8 has co-occurring neurocognitive disorder secondary to traumatic brain injury.

175.    Beginning in 2012, John Doe #8 has required multiple admissions to the TCU, CSU and MHTF levels of care to address his serious mental health needs. Over the last three years, John Doe #8 has bounced around the FDC's inpatient mental health units going from Suwannee CI to Lake CI MHTF to Union CI to Suwannee CI then back to Lake CI where he has spent over a year in his current MHTF admission.

176.    In April 2015, John Doe #8 was in the CSU at Suwannee CI for "unpredictable behavior, limited ability to function, speaking incoherently, not coming out of his cell for anything and disorganized thoughts."

35

177.    On May 1, 2015, the Suwannee CI mental health staff made a referral for John Doe #8 to be moved to the MHTF level of care because of his continued deterioration.

178.    After this referral was sent to FDC central office, John Doe #8 languished in the Suwannee CI CSU for an entire month before he was finally moved to the appropriate level of inpatient mental health care. The reason for the delay: there was a "wait list" for people in acute mental health crises to be moved to MHTF care.

179.    When John Doe #8 finally arrived to the MHTF, he was described as disheveled, frail, disoriented and only eating one or two bites of food when he received his food tray.

180.    John Doe #8's ISP indicates his problems include thought disorder and resistance to treatment. Every ISP for years, regardless of the level of inpatient mental health care, has noted John Doe #8 "continues to refuse treatment" and "does not come out of his cell." The plans note John Doe #8 "has not shown any improvement" and "continues to be confused and thinking is disorganized."

181.    Remarkably, John Doe #8's current MHTF ISPs are virtually identical to the ISPs from previous unsuccessful inpatient stays. Even though none of the prior plans proved effective, the same interventions continue to be included virtually unchanged through his current 2016 ISPs.

182.    Year after year, John Doe #8's ISPs suggest individual counseling once per week, group therapy session weekly and recreation weekly. This plan is nearly identical to the service plans of many other inmates in the FDC's inpatient care regardless of their diagnosis or problem code.

183.    John Doe #8's plans have these same interventions listed in sections where the problem area is left blank by mental health staff. The interventions are simply pre-filled on almost every ISP to be used for inmates regardless of what the problem code or issue may be.

36

184.    As a result of inadequate treatment interventions, John Doe #8 continues to languish at Lake CI. He does not attend any activities, group therapy sessions or individual counseling sessions. Notes consistently indicate John Doe #8 is making "poor progress" yet no attempt is made to modify his treatment interventions or seek consultation regarding how to help this inmate try to progress.

185.    Although the mental health staff have not substantively modified John Doe #8's interventions or service plans for years, they have spent many hours documenting every single one of John Doe #8's "refusal" of services.   John Doe #8's records include hundreds of pages of well-documented "refusals" of care.  Stunningly, there are hardly any pages dedicated to discussing how to modify ineffective treatment interventions or help John Doe #8 progress in treatment.

186.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Suwannee CI, Union CI and Lake CI and they have failed to take reasonable measures to address it. Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Suwannee CI, Union CI and Lake CI through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it.  The failure to provide John Doe #8 with any meaningful treatment to address his "refusals" of care places him at a continued risk of harm.

**John Doe #9**

187.    John Doe #9 has been incarcerated in the FDC since May 2013. John Doe #9 was in the MHTF at Lake CI from October 2015 to October 2016.  He was then discharged to the TCU at

Union CI.  Within a matter of weeks, he was returned to the inpatient unit at Lake CI.  John Doe #9 is currently housed in the inpatient unit at Suwannee CI.

188.    John Doe #9 has a diagnosis of schizoaffective disorder, bipolar type with psychotic features. He has also been diagnosed since his incarceration in FDC with borderline personality disorder, antisocial personality disorder, and depression.

189.    Since his incarceration John Doe #9 has been involved in numerous instances of self-injurious behavior.  As a result of these incidents he has had multiple admissions to FDC inpatient mental health units including Charlotte CI, South Florida Reception Center, Union CI, and Lake CI.

190.    John Doe #9 has been continuously housed in FDC inpatient units since June 5, 2015.

191.    While confined at the Union CI inpatient mental health unit from June to October 2015, John Doe #9 engaged in multiple acts of self-harm.  The inpatient mental health unit at Union CI lacked sufficient trained staff to appropriately address John Doe #9's mental illness.

192.    While John Doe #9 was confined on the inpatient mental health unit at Union CI, his behaviors caused by his untreated mental illness resulted in multiple uses of physical force and emergency involuntary injections of psychotropic medications to deal with his "agitation."

193.    On several of these occasions John Doe #9 was disciplined for the behavior that gave rise to the use of the psychotropic medications. For example, on consecutive days September 2015 while John Doe #9 was confined on the Union CI inpatient mental health unit, the psychiatrist issued ETOs allowing force to be used to involuntarily medicate John Doe #9 because of extreme agitation related to his mental illness. The inpatient clinical staff issued multiple disciplinary reports against John Doe #9 during that same time for "attempted battery on staff"

38

and "disobeying a verbal order" for actions that occurred while the staff were trying to involuntarily medicate him due to being in the throes of psychiatric emergencies.

194.    At the time of John Doe #9's disciplinary hearing, the mental health staff provided no information to the disciplinary team on how John Doe #9's mental illness contributed to the behavior giving rise to the disciplinary report even though the behavior cited in the discipline report was directly related to the need for the emergency injection ordered by the psychiatrist. As a result, John Doe #9 was disciplined for his behavior.

195.    Shortly thereafter, Union CI mental health staff obtained an order admitting John Doe #9 to the MHTF at Lake CI.

196.    For the year that he was admitted to the MHTF at Lake CI, John Doe #9 engaged in repeated instances of serious self-harm. Several of the incidents were so serious that they required transport to outside medical facilities for emergency care. His actions included ingestion of pieces of metal wire, hoarding and overdosing on his prescription medications, and multiple instances of stabbing himself in the abdomen with sharpened wire, paperclips, and nails while confined to the inpatient mental health unit. Several of these incidents occurred while he was in suicide observation status as a result of earlier attempts to harm himself.

197.    John Doe #9's ISPs developed at Lake CI from October 2015 through April 2016 listed self-injurious behavior as the primary focus of his treatment.  Each monthly treatment plan stated that his self-injurious behavior would be addressed by having John Doe #9 identify and utilize "three adaptive behaviors" to replace his self-injurious behaviors.

198.    During the six months that these ISPs were in effect, his treatment notes contain no indication that this treatment activity was actually carried out or attempted. There is no mention

in his treatment notes of the adaptive behaviors, how John Doe #9 would learn those behaviors, or what progress, if any, John Doe #9 made towards learning or utilizing the adaptive behaviors.

199.    Instead, the treatment staff's response to these incidents has consisted of placing John Doe #9 in isolation cells, ordering emergency treatment via chemical restraints, using physical restraints or a combination of the above. The inpatient mental health staff did not engage in any treatment activities to address John Doe #9's behavior and underlying personality disorder.

200.    In May 2016, John Doe #9's ISP was amended to delete the unattained goal of learning and utilizing the adaptive behaviors. It was replaced with a simple declaration that John Doe #9 would not engage in any self-injurious behavior for multiple consecutive weeks by May 2017. There was no indication in John Doe #9's ISPs or in his records how this goal might be achieved.

201.    John Doe #9's self-injurious behaviors continued and were cited as the justification for obtaining a renewed court order continuing his confinement on the Lake CI MHTF just a few months ago.

202.    Recently, John Doe #9 was discharged from the Lake CI MHTF and transferred to the Union CI TCU. In the Union CI TCU, treatment activities are routinely canceled due to a lack of security staff. What treatment activities are received consist of sitting outside in a cage or watching television for two hours on the weekend. Within weeks of being discharged to the Union CI TCU, John Doe #9 was returned to the inpatient unit at Lake CI. John Doe #9 is currently housed in the inpatient unit at Suwannee CI.

203.    Defendants have failed to ensure that inpatient mental health units are capable of providing individualized appropriate treatment for individuals who engage in self-injurious behavior.

40

204.     The FDC knows that this type of care is necessary. Prior to privatization of FDC mental health care, the inpatient mental health staff at Lake CI provided specialized care for individuals who engaged in self-harm due to mental illness such as borderline personality disorder. After privatization, these therapeutic treatments were abandoned and the FDC has not required the Contractor to provide it.

205.     The failure to provide John Doe #9 with any meaningful treatment intervention to modify his self-injurious behavior places him at continued risk of harm or death.

206.     Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment provided at the various inpatient institutions at which John Doe #9 was and is confined and they have failed to take reasonable measures to address it.  Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at these inpatient units through the CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it.

**John Doe #10**

207.     John Doe #10 entered the FDC in 1991.  He is currently housed in the inpatient unit at Suwannee CI.  His current diagnoses are Schizophrenia, Paranoid Type and Antisocial Personality Disorder.

208.     From 1991 to 1994, John Doe #10 lived in general population and held job assignments. In 1995, John Doe #10 was put into disciplinary confinement.  From 1995 until 2010, John Doe #10 cycled between close management and disciplinary confinement with an occasional admission to inpatient mental health care in the FDC.

209.     After 15 years in confinement, John Doe #10 was admitted to inpatient mental health care in 2010.  He has been there continuously for six years.

41

210.    For at least the last few years, John Doe #10 has refused almost all treatment offered to him. This includes refusing individual counseling, group counseling, activity therapy and medications. He also refuses recreation. One clinician labeled him a "chronic refuser."

211.    John Doe #10 rarely leaves his cell or participates in treatment as a result of his mental illness.

212.    John Doe #10's ISPs all look the same. For years, the FDC's ISPs identify John Doe #10 as resistant to treatment, 100% non-compliant and/or refusing all treatment. But there is no indication his treatment resistance is being addressed in any meaningful way.

213.    John Doe #10's interventions in his ISP mirror the interventions of almost every other ISP for inpatient residents regardless of their mental health stability, identified problem codes or diagnoses.

214.    John Doe #10's goals in his ISP are tied to the percentage of treatment activities in which he participates. Rather than try to engage John Doe #10 in treatment or activities, the clinicians simply keep decreasing the expected level of participation. One ISP included a goal of 25% participation in treatment activities. On the next ISP it was lowered to 10% participation. On the next ISP it was lowered to 5% participation. None of the interventions or treatments have been modified during this same period.

215.    John Doe #10's refusals of treatment and out-of-cell activities are well documented by the FDC. A review of John Doe #10's inpatient mental health file reveals hundreds of pages of "refusal of treatment" forms signed off by clinicians and other inpatient mental health unit staff for each activity in which John Doe #10 does not participate.

216.    Group therapy is offered together with individual therapy and "therapeutic community" once per week and refused. Activity therapy is offered twice per week and refused. Even if John

Doe #10 participated in these treatment opportunities, the number of days that treatment and out-of-cell time are offered is woefully inadequate.

217.    Additionally, mental health staff dutifully create a weekly summary of John Doe #10's refusals of every treatment and out-of-cell activity offered to him. However, there are hardly any records in John Doe #10's extensive file noting clinicians' attempts to get him to engage in treatment or even leave his cell for recreation.

218.    John Doe #10's living conditions and lack of treatment essentially amount to long-term solitary confinement. The lack of treatment and attempts to engage John Doe #10 in at least leaving his cell will result in extended confinement and segregation in the inpatient mental health unit and limited privileges.

219.    Defendants were and are aware of the serious harm or risk of serious harm caused by the inadequate mental health care and treatment at Suwannee CI and they have failed to take reasonable measures to address it. Defendants have actual knowledge of the inadequate mental health care and treatment for inpatient inmates with mental illness at Suwannee CI through CMA and FDC's own monitoring and other sources and they have failed to take prompt action to stop it. Further, the failure to provide John Doe #10 with any meaningful treatment to aid in his refusal to engage in treatment or leave his cell for recreation places him at a continued risk of harm.

### The FDC Knows of the Inadequate Care Being Provided at Inpatient Units and has Failed to Correct the Deficiencies

220.    From at least 2013 to the present date, the FDC has been aware that inmates with serious mental illness in the inpatient mental health units have been denied necessary mental health care to address their known serious mental health needs. Reports provided to the FDC from other

agencies and the FDC's own monitoring of its Contractor's compliance, or lack thereof, with HSBs has demonstrated gross deficiencies in care.

221.    The FDC knows, and has known, that the deficiencies in medical and mental health care on inpatient mental health units has caused significant harm to and deaths of inmates confined on those units.

222.    The FDC knows its Contractor consistently fails to provide the number of hours of out-of-cell structured mental health treatment to the mentally ill inmates in the inpatient units. FDC's reviews of inpatient mental health records for contract monitoring has demonstrated wide spread failure to provide the required hours of structured out-of-cell mental health treatment therapy services. When inpatient inmates were allowed out of their cells they were rarely, if at all, provided therapeutic services. Most out-of-cell hours were for unstructured recreation time not meeting the HSB definition of "out-of-cell structured therapeutic activities."

223.    In multiple routine contract monitoring visits, the FDC found zero percent performance in providing out-of-cell structured therapeutic services for the inpatient inmates in the TCU, CSU, and MHTF.

224.    In multiple contract monitoring visits, the FDC found grossly inadequate performance on the creation and revision of the ISPs, documents which are the foundation for provision of appropriate mental health care to inmates.

225.    In multiple contract monitoring visits, the FDC found grossly inadequate performance for provision of psychiatric evaluations to inmates requiring psychotropic medications.

226.    In spite of this knowledge, the Defendants have failed to correct the widespread constitutional deficiencies.

44

<u>COUNT I</u>
## VIOLATION OF THE EIGHTH AMENDMENT DUE TO INADEQUATE MENTAL HEALTH CARE AND TREATMENT UNDER 42 U.S.C. §1983 (DEFENDANT SECRETARY)

227.     This count is brought under the Eighth Amendment to the U.S. Constitution pursuant to 42 U.S.C. §1983 against Defendant Secretary in her official capacity.

228.     Plaintiff repeats and realleges the prior paragraphs in this Complaint as if fully set forth herein.

229.     The Eighth Amendment's prohibition on cruel and unusual punishment obligates prison officials to provide inmates with adequate medical and mental health care.

230.     The Plaintiff's clients and constituents housed in FDC's inpatient units are individuals with serious medical needs in the form of severe mental illnesses.

231.     The Plaintiff's clients and constituents housed in FDC's inpatient mental health units have faced and continue to face a significant risk of harm, including death, due to Defendant Secretary's failure to provide adequate mental health care, as described herein, to individuals housed in FDC's inpatient mental health units.

232.     Defendant Secretary knows, and has known, that the persons in FDC custody in the inpatient mental health units described herein have serious medical needs in the form of serious mental illnesses, yet Defendant Secretary has failed and deliberately refused to provide the necessary aid and treatment that would alleviate those serious medical needs.

233.     Defendant Secretary knows, and has known, of the inadequate mental health treatment of inmates in her inpatient mental health units and knew that this posed a pervasive risk of harm, including death, to those inmates. Defendant Secretary's response to the risk has been so inadequate and unreasonable that it constitutes deliberate indifference to the inmates' rights as guaranteed by the Eighth Amendment to the United States Constitution.

45

234.    Defendant Secretary's pattern and practice of failing to provide constitutionally adequate mental health care and treatment for inmates with mental illnesses in the inpatient mental health units violates the Eighth Amendment rights of these inmates. Defendant Secretary has been deliberately indifferent to the serious medical needs of the persons confined in FDC's inpatient mental health units. While Defendant Secretary has contracted with private entities to provide medical care, she nonetheless has a non-delegable duty to ensure adequate medical care for all inmates in her custody.

235.    As a direct and proximate cause of Defendant Secretary's pattern, practice, and deliberate indifference, Plaintiff's clients and constituents have suffered, and continue to suffer from harm and violation of their Eighth Amendment rights. These harms will continue unless enjoined by this Court.

## COUNT II
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### (DEFENDANT FDC)

236.    Plaintiff repeats and realleges the prior paragraphs in this Complaint as if fully set forth herein.

237.    This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, et seq. & 42 U.S.C. §12131, *et seq.*, and its implementing regulations against the Defendant Florida Department of Corrections.

238.    Title II of the ADA prohibits disability-based discrimination by any public entity. 42 U.S.C. §§12131-12132.

239.    Defendant FDC is a public entity.  42 U.S.C. §12131(1).

240.    All individuals mentioned herein who are in FDC custody are qualified individuals with a disability.  42 U.S.C. §§12131(2) & 12101(1).

46

241.    The ADA imposes an affirmative duty on public entities to create policies or procedures
and to implement policies or procedures to prevent discrimination based on disability.

242.    Defendant FDC has a pattern and practice of excluding qualified individuals with
disabilities from participation in, and denying those individuals the benefits of services,
programs, and activities, by reason of those disabilities. 42 U.S.C. §12132

243.    Visitation, religious services, canteen services, library services, recreation, and work
programs, are services, programs or activities of the FDC.

244.    Defendant FDC excludes Plaintiff's clients and constituents housed in the FDC's
inpatient mental health units from participating and benefiting in these programs, services, and
activities, and subjects them to discrimination because of their disabilities.

245.    As a result of their continued isolation in the inpatient mental health units resulting from
constitutionally inadequate provision of mental health care, the inmates housed in these units
were and continue to be denied the ability to participate in the FDC's activities, services or
programs provided to inmates in non-isolated settings.  This discrimination is the result of their
disabilities by FDC's agents and employees. Such a denial of services constitutes discrimination
against individuals based on their disability in violation of Title II of the ADA.

246.    Defendant FDC's practice of allowing inmates with mental illness to be disciplined and
punished for conduct that was the direct result of their mental illness constitutes discrimination
against individuals based on their disability in violation of the ADA.

247.    Defendant FDC has discriminated against Plaintiff's clients and constituents in inpatient
mental health units by failing to provide non-segregated and non-isolated housing and adequate
mental health care as a reasonable accommodation to prevent the exacerbation of the inmates'

mental illness and the unnecessary continuation of their confinement on the inpatient mental health units.

248.     The denial of necessary services to inmates housed in the FDC's inpatient mental health units by its agents and employees denies the inmates the benefits of the services, programs, or activities of FDC's inpatient units in violation of Title II of the ADA.

249.     Defendant FDC fails to house inmates with mental illness in the most integrated setting appropriate to their needs; places inmates with mental illness in inappropriate security classifications; places inmates with mental illness in facilities that do not offer the same programming as other facilities; and deprives inmates with mental illness of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

250.     Defendant FDC has known about the violations noted herein but has failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff's clients and constituents in inpatient units in FDC custody.

251.     As a direct and proximate cause of this pattern, practice, and deliberate indifference, Plaintiff's clients and constituents have suffered, and continue to suffer from harm and violation of their ADA rights. These harms will continue unless enjoined by this Court.

## COUNT III
## VIOLATIONS OF THE FEDERAL REHABILITATION ACT
### (DEFENDANT FDC)

252.     Plaintiff repeats and realleges the prior paragraphs in this Complaint as if fully set forth herein.

253.     The Federal Rehabilitation Act (FRA) prohibits discrimination against an individual based on disability by any program or entity receiving federal funds. 29 U.S.C. §§794(a) and (b)(2)(B).

254.    The inmates housed in the FDC's inpatient mental health units are persons with disabilities as defined in the FRA.

255.    Defendant FDC is a program or entity which receives federal financial assistance.

256.    Defendant FDC's inpatient mental health units are facilities and their operation comprises a program and services for purposes of the FRA.

257.    The inmates housed in the FDC's inpatient mental health units are qualified to participate in or receive the benefit of FDC's services, programs, or activities.

258.    As a result of their continued isolation in the inpatient mental health units resulting from constitutionally inadequate provision of mental health care, the inmates housed in these units were and continue to be denied the ability to participate in the FDC's activities, services or programs provided to inmates in non-isolated settings.  This discrimination is the result of their disabilities by FDC's agents and employees. Such a denial of services constitutes discrimination against individuals based on their disability in violation of the FRA.

259.    Defendant FDC's practice of allowing inmates with mental illness to be disciplined and punished for conduct that was the direct result of their mental illness constitutes discrimination against individuals based on their disability in violation of the FRA.

260.    The FRA imposes an affirmative duty on public entities to create policies or procedures and to implement policies or procedures to prevent discrimination based on disability.

261.    Defendant FDC has a pattern and practice of excluding qualified individuals with disabilities from participation in, and denying those individuals the benefits of services, programs, and activities, by reason of those disabilities.

262.    Visitation, religious services, canteen services, library services, recreation, and work programs are services, programs or activities of the FDC.

263. Defendant FDC excludes Plaintiff's clients and constituents housed in the FDC's inpatient mental health units from participation in, and denies them the benefits of these programs, services, and activities, and subjects them to discrimination, because of their disabilities.

264. As a result of their continued isolation in the inpatient mental health units resulting from constitutionally inadequate provision of mental health care, the inmates housed in these units were and continue to be denied the ability to participate in the FDC's activities, services or programs provided to inmates in non-isolated settings. This discrimination is the result of their disabilities by FDC's agents and employees. Such a denial of services constitutes discrimination against individuals based on their disability in violation of the FRA.

265. Defendant FDC has discriminated against Plaintiff's clients and constituents in inpatient units by failing to provide non-segregated and non-isolated housing and adequate mental health care as a reasonable accommodation to prevent the exacerbation of the inmates' mental illness and the unnecessary continuation of their confinement on the inpatient units.

266. The denial of necessary services to inmates housed in the FDC's inpatient mental health units by its agents and employees denies the inmates the benefits of the services, programs, or activities of FDC's inpatient units in violation of the FRA.

267. Defendant FDC fails to house inmates with mental illness in the most integrated setting appropriate to their needs; places inmates with mental illness in inappropriate security classifications; places inmates with mental illness in facilities that do not offer the same programming as other facilities; and deprives inmates with mental illness of visitation with family members by placing them in distant facilities where they would not otherwise be housed.

50

268.    Defendant FDC has known about the violations noted herein but has failed to correct

them, thereby exhibiting deliberate indifference to the rights of Plaintiff's clients and

constituents in inpatient units in FDC custody.

269.    As a direct and proximate cause of this pattern, practice, and deliberate indifference,

Plaintiff's clients and constituents have suffered, and continue to suffer from harm and violation

of their FRA rights. These harms will continue unless enjoined by this Court.

<h3 align="center">REQUEST FOR RELIEF</h3>

WHEREFORE, Disability Rights Florida, on behalf of inmates with mental illness who

are currently confined in the FDC's inpatient mental health units, requests that this Court:

A.    Accept jurisdiction of this case and set it for trial at the earliest opportunity;

B.    Declare that the actions and inactions of the Defendants are unlawful and unconstitutional

for the reasons specified above;

C.    Enjoin Defendants from continuing to violate the constitutional and statutory rights of the

mentally ill inmates confined in the FDC's inpatient mental health units as well as those inmates

who may, at some point in the future, be transferred to those units.  Specifically, Plaintiff seeks

an injunction requiring Defendant Secretary to change her customs, policies, and practices to

ensure that inmates with serious mental illness receive constitutionally adequate mental health

treatment, and Plaintiff seeks an injunction requiring Defendant FDC to stop discriminating

against the inmates on the FDC's inpatient mental health units on the basis of their disabilities;

D.    Retain jurisdiction over this matter to ensure that the terms of any injunction are fully

implemented;

E.    Award Plaintiff its costs and reasonable attorneys' fees pursuant to 42 U.S.C. §1988 and

42 U.S.C. §12205; and

F.    Award all other necessary and appropriate relief that this Court may deem appropriate.

Respectfully Submitted,

Peter P. Sleasman
Trial Counsel
Fla. Bar No. 367931

Kristen Cooley Lentz
Fla. Bar No. 649635
Disability Rights Florida
4723-B NW 53rd Ave
Gainesville, FL 32563
850-488-9071 (telephone)
850-488-8640 (facsimile)
KristenL@disabilityrightsflorida.org
PeterS@DisabilityRightsFlorida.org

David Allen Boyer
Fla. Bar. No. 090917
Disability Rights Florida
1930 Harrison St., Suite 104
Hollywood, FL 33020
850-488-9071 (telephone)
850-488-8640 (facsimile)
DavidB@disabilityrightsflorida.org

Andrea Costello
Fla. Bar No. 532991
Christopher M. Jones
Fla. Bar No. 994642
Florida Legal Services
14260 W. Newberry Road, #412
Newberry, FL 32669
(407) 801-0332 (telephone)
(407) 505-7327 (facsimile)
Andrea@floridalegal.org
Christopher@floridalegal.org

George E. Schulz, Jr.
Fla. Bar No. 169507
Laura Renstrom
Fla. Bar No. 108019
Holland & Knight LLP
50 North Laura Street Suite 3900

Jacksonville, FL 32202
(904) 353-2000 (telephone)
(904) 358-1872 (facsimile)
Buddy.Schulz@hklaw.com
Laura.Renstrom@hklaw.com

**Attorneys for Plaintiff**

*i*