UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DISABILITY RIGHTS FLORIDA, INC.,
On behalf of its Clients and Constituents,

Plaintiff,

vs.                                    Case No.      3:18-cv-179-J-25JRK

JULIE JONES, Secretary, Florida Department
of Corrections in her Official Capacity and
FLORIDA DEPARTMENT OF CORRECTIONS,
an Agency of the State of Florida,

Defendants.
_____/

## SETTLEMENT AGREEMENT

## I.      INTRODUCTION

A.      This Settlement Agreement ("Agreement") comes before the Court on the Complaint filed by Plaintiff, Disability Rights Florida, Inc., on January 30, 2018 (DE 1), on behalf of its clients and constituents seeking declaratory and injunctive relief on behalf of inmates within the Florida Department of Corrections (FDC) who are currently clients and constituents of Disability Rights Florida and who are mentally ill and confined in a FDC inpatient mental health unit or who may be transferred to a FDC inpatient mental health unit. Plaintiff, Disability Rights Florida, (DRF), is an organization charged by federal law to protect the rights of individuals with mental illness in Florida. Defendants are Julie Jones, in her official capacity as Secretary of the Florida Department of Corrections, and the Florida Department of Corrections (collectively "Defendants" or "FDC"). The Defendants and the Plaintiff shall be referred to in this Agreement collectively as the "Parties."

B.      Jurisdiction and Venue:      This action is brought by Disability Rights Florida, Inc., on behalf of its clients and constituents, pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. § 12132 et seq., and the Federal Rehabilitation Act ("FRA"), codified at 29 U.S.C. § 794. Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202. This Court has personal jurisdiction over the Defendants. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district – over 70% of the FDC inpatient mental health beds are located in this district, and the largest number of inpatient health beds are located in this division. For purposes of this Agreement, or any action to enforce this Agreement, Defendants consent to the Court's jurisdiction over this Agreement or such action and over Defendants, and consent to venue in this judicial district.

1

C.     In the Complaint, Plaintiff alleges Defendants, by their actions and inactions, have deliberately and chronically denied mental health care to individuals with mental illness who were and are confined in inpatient mental health units operated and managed by Defendants.  Plaintiff alleges that many of these patients are confined in segregated, isolated and harsh conditions which exacerbate their illnesses.  As a result of their segregation and isolation, Plaintiff claims that these patients are denied the benefits of many of the Defendants' programs, services and activities.

D.     On February 20-23, 2017, the FDC allowed Plaintiff's expert team access to Union CI and Lake CI to view and tour the physical plant, including the housing areas, treatment space, staff office space, recreation areas, indoor recreation space, dayroom, medication and administration areas.  Plaintiff's experts were also permitted to observe daily operations, group treatment, individual treatment, treatment team meetings, medication passes, meal time and disciplinary or classification meetings.  The experts were permitted to interview FDC management staff and health services staff and 4-5 patients per inpatient level of care at each facility.

E.     The Defendants  state that prior to and since the initiation of this litigation, the FDC commenced significant initiatives to improve recruiting and retention of qualified security staff and enhance the delivery of mental health services.  This process has been ongoing prior to and throughout the course of this litigation. To date, the FDC's initiatives include, but are not limited to, the following: Creation of a Central Office Mental Health Ombudsman and Mental Health Ombudsman four at (4) inpatient units; Creation of a Behavior Risk Management Team (BRMT) comprising one (1) psychologist, a part-time psychiatrist and a part-time psychiatric nurse; development and implementation of two (2) Quality Assurance instruments (MHIMI – Mental Health Inpatient Monitoring Instrument and STAMI – Structured Therapeutic Activities Monitoring Instrument) to monitor mental health services in inpatient units; policy revisions; targeted training for security staff; site visits conducted by OHS leadership.

F.     Beginning in January 2017, the Parties engaged in multiple mediation sessions with the Honorable Harvey E. Schlesinger, U.S. District Judge, to see if they could come to an amicable, mutually agreeable resolution of this matter prior to filing a Complaint.  To immediately address the significant and urgent conditions state-wide, to avoid costly and protracted litigation, and to settle the disputes in this action fully and finally, the Parties have voluntarily agreed, subject to the terms and conditions of this Agreement, to resolve all claims and issues in this action by entering into and requesting the Court's approval of this Agreement.   The Parties agree that the representations made in this Agreement are in compliance with 18 U.S.C. § 3626, fair, reasonable, and adequate to protect the interests of all Parties.  The Parties further believe that this Agreement will benefit mentally ill patients who are housed in a FDC inpatient mental health unit.

G.     The terms of this Agreement shall be applicable to and binding upon the Defendants in their official capacities, and their officers, agents, employees, assigns, and successors for the duration of the time specified herein. This Agreement applies to all of the FDC's existing inpatient mental health units and any new facilities that will provide inpatient mental health care during the life of this Agreement. The FDC agrees that the services and treatment required by this Agreement are necessary to satisfy patient treatment needs and the FDC further agrees, in the event it engages

a third party to perform any act needed to comply with the terms of the Agreement, it will contractually obligate such third party to satisfy the terms of the Agreement.

H.      The Agreement becomes effective at the time of adoption by the Court.  The Parties will file this Agreement with the Court and ask that the Court adopt the terms of the Agreement as an order of the Court and retain jurisdiction to enforce its provisions as specified in Section XIV of this Agreement.  Adoption of the Agreement by the Court is a condition precedent to the Agreement's enforcement.

## II.      DEFINITIONS

A.      **Department**:  means the Florida Department of Corrections (FDC).

B.      **Confidentiality Agreement**: means the agreement entered into by the parties allowing access to and protecting the confidentiality of any protected health information of current or former mentally ill patients housed in an inpatient unit within the FDC.  The Confidentiality Agreement will be submitted to the Court no later than March 15, 2018.

C.      **Core Mental Health Services**: means individual and group therapy, case management, therapeutic community and medication management.  These services must be provided by a mental health care professional who is qualified in accordance with applicable Florida statutes and regulations.

D.      **Corrections Mental Health Treatment Facility (CMHTF)**:  means any extended treatment or hospitalization-level unit that the assistant secretary for health services specifically designates by Rule 33-404.201, F.A.C., to provide acute mental health care and that may include involuntary treatment and therapeutic intervention, in contrast to less intensive levels of care such as out-patient mental health care, infirmary mental health care, transitional mental health care, or crisis stabilization care.

E.      **Crisis Stabilization Care (CSU)**: means a level of care that is less restrictive and intensive than care provided in a corrections mental health treatment facility that includes a broad range of evaluation and treatment services provided within a highly structured residential setting. It is intended for patients who are experiencing debilitating symptoms of acute mental impairment and who cannot be adequately evaluated and treated in a transitional care unit or in infirmary mental health care. Such treatment is also more intensive than in transitional care units as it is devoted principally toward rapid stabilization of acute symptoms and conditions.

F.      **Policy**: means Procedure Manuals (PM) and Health Services Bulletins (HSB) that provide requirements and guidelines for the provision of inmate health care which is a component of the Department's comprehensive health care delivery system.  HSBs do not take the place of or override Department of Corrections' rules or PMs.  HSBs provide additional guidance as a supplement to sound clinical judgment for the delivery of health services within each institution.

G.      **Individualized Services Plan (ISP)**: means a dynamic, written description of an patient's current mental health problems, goals, and services that is developed and implemented by a multi-disciplinary services team and the patient.

3

**H.    Multi-Disciplinary Services Team (MDST):** means the staff representing different professions, disciplines, or service areas, which comprise a team that provides assessment, care, and treatment to the patient, and develops, implements, reviews, and revises an "Individualized Service Plan," as needed.

**I.    Self-Harm Observations Status (SHOS):** means to a clinical status ordered by the attending clinician that provides for safe housing and close monitoring of patients who are determined to be suicidal or at risk for serious self-injurious behavior, by mental health staff, or in the absence of mental health staff, by medical staff.

**J.    Serious Self-Injurious Behavior:** means an patient's deliberate self-harm behavior that has or could have caused serious bodily harm as assessed by mental health staff, or in the absence of mental health staff, by medical staff, as evidenced by the need for medical care.

**K.    Structured Out of Cell Treatment and Services (SOCTS):** means weekly scheduled individualized treatment services, psychoeducational groups and therapeutic activities to ameliorate disabling symptoms of mental illness and improve behavioral functioning as identified in the ISPs.

**L.    Psychoeducational Group and Therapeutic Activity:** means a treatment service designed to improve resiliency in behavioral functioning and self-directed recovery as identified in the ISP.

**M.    Transitional Mental Health Care (TCU):** means a level of care that is more intensive than outpatient and infirmary care but less intensive than crisis stabilization care, characterized by the provision of mental health treatment in the context of a structured residential setting. Transitional mental health care is indicated for a person with chronic or residual symptomology who does not require crisis stabilization care or placement in a corrections mental health treatment facility but whose impairment in functioning nevertheless renders him or her incapable of adaptive functioning within the incarceration environment.

**N.    Unstructured Out of Cell Time:** means out of cell activities monitored by security staff without involvement of mental health staff. Examples include outdoor recreation, dayroom, visitation, telephone calls, showers, etc.

## III.    IMPLEMENTATION TIMELINE

The Parties agree that systemic reform will require a significant modification to the current delivery of mental health services, and that such reform will require a multi-year approach. Further, the Parties acknowledge that all funds required to meet the requirements of this Agreement must be appropriated by the Florida Legislature, and that this Agreement does not bind the Legislature to any specific appropriations.

A.    Upon the effective date of this Agreement, the FDC will:

1. Within ninety (90) calendar days of the effective date of this Agreement, patients on the Lake inpatient mental health units shall receive individualized assessment for use of restraints.

2. The Parties agree the FDC will discontinue the use of the TCU at UCI for inpatient mental health care by the execution date of this Agreement. The FDC may, however, resume use of these dorms if adequate modifications are made to the facility to provide sufficient treatment space.

3. One year after the effective date of the Agreement:

    a. Implement the Oversight requirements of paragraph IV. G. and continue those provisions for the duration of this Agreement;
    b. Complete relevant policy and procedure review and initiate rule making process;
    c. Complete modification to training materials and train staff as required in Section IV.

4. Two years after the effective date of the Agreement:

    a. Continue training of inpatient mental health and security staff as needed or as they are assigned to the inpatient mental health units;
    b. Complete construction of open court or yard area for those inpatient mental health units without current access to an open court or yard.

B.      Whenever the FDC has agreed to adopt new procedures, HSBs, policies, or rules in this Agreement, unless otherwise specified, the time frame for submission of such proposed procedures, HSBs, policies, or rules to Plaintiff shall not exceed six (6) months from the approval date.

C.      Whenever a specific time frame for the achievement of a particular goal is not specified herein, the time frame shall be a "reasonable time" as interpreted initially by the CMA monitoring team.

## IV.    RELIEF

A.    **Individualized Treatment**

The FDC shall provide individualized treatment for patients assigned to inpatient mental health units as follows:

1. **Creation and Revision of ISPs:** Individualized treatment requires the creation of an ISP. The FDC will:

    a. Provide treatment plans individualized to the patients' needs. Treatment goals will match the documented problems identified for each patient.

b. Ensure ISPs include measurable goals. The process to achieve the goals will include, as clinically appropriate, group therapy, individual psychotherapy, medication management and transition planning.

c. Ensure ISPs are updated in accordance with policy to reflect changes in patient's treatment progress.

d. MDST meetings will be scheduled to address initial placement on the unit, refusal of treatment for more than five days, receipt of a DR, refusing to maintain hygiene for more than seven days, significant changes in mental status and/or behavioral functioning, "significant events" as referenced in policy and transfer to a different level of care.

e. The patient will be invited to attend the MDST meeting.  If the patient is not able to attend or refuses, an incidental note will be entered in the mental health record, identifying the reason for non-attendance and encouragement that was provided.

f. For each patient being discussed at the MDST meeting, each staff member on the patient's ISP will provide input. The patient should be asked how treatment is progressing from his or her perspective, and to participate in the development of a collaborative plan of care.

g. The supervising psychologist or Psychological Services Director, in consultation with the inpatient unit's OIC and the treating mental health clinician, will have the authority to modify property, activity, and privileges available in the level system based on the individual treatment needs of the patient.  If such modifications will be ongoing, the MDST must review and approve them and will be documented in the patient's mental health records.

h. The MDST team will review the treatment plan in its entirety with the patient, and will give the patient an opportunity to read and review the treatment plan before signing.  The patient shall be provided a copy of the plan, unless the patient is on SHOS, and the attending clinician documents the specific clinical justification for withholding it.

i. Patients who have been in the CSU for sixty (60) days or longer, or the TCU for one (1) year or longer will be reviewed by a regional mental health consultant to determine whether additional services or a higher level of care is clinically indicated. The consultation and determination regarding care will be documented via an incidental note in the patient's mental health record and reported to the FDC Chief of Mental Health Services, or his or her designee, for review.

2. **Provision of Treatment and Services:**  To provide treatment and services, the FDC will:

   a. Provide mental health treatment and services that uses evidence-based practices and measures for treatment progress to guide continued or modified treatment.

   b. Ensure all patients in the inpatient units are offered a minimum of ten hours per week of SOCTS tied to the patient's ISP.  Unstructured recreation time shall not be counted toward the minimum required hours of SOCTS.

   c. Patients on the units shall receive unstructured out-of-cell time in accordance with an individual determination assessing their required level of restraint and freedom of movement.  In no case shall any patient be offered less than ten hours of unstructured out-of-cell time per week unless there is an individualized determination by the MDST and the clinical justification is documented in the inpatient mental health record.  Five hours of the unstructured out-of-cell time shall be exercise outdoors.

   d. The minimum number of hours required for SOCTS and unstructured out of cell time shall be offered to all patients regardless of their privilege level.

   e. Tailor SOCTS to the individual needs of the patient.

   f. Offer individual psychotherapy, group therapy, and clinical encounters with psychiatric and psychology clinicians in treatment rooms that provide for an appropriate level of confidentiality.

   g. Offer therapeutic community group in a location with all participants able to share their issues with each other and the clinicians.  The goals of therapeutic community are to identify concerns and develop verbal problem solving skills.

   h. Provide appropriately credentialed clinical staff.

3. **Serious Self-Injurious Behavior ("SIB") Treatment:**  The FDC will provide the following treatment for SIB:

   a. Provide appropriate assessment for the causes of serious SIB.

   b. Require clinicians to create treatment plans as warranted by the SIB assessments to include the antecedent, triggers and consequences of  each incident of SIB.

   c. Modify treatment plans over time as needed.

   d. Train staff to assess, create, implement and modify treatment plans.

    e. A psychologist will be assigned to each inpatient unit to create, implement and modify treatment plans collaboratively with other members of the MDST and the patient.

    f. Create a systematized program to provide appropriate interventions, including, but not limited to, cognitive behavioral therapy and dialectical behavioral therapy, for inpatient patients identified as at risk for serious self-injurious behavior.

4. **Self-Harm Assessments and SHOS Supervision:**  In order to better identify and remediate cases of self-harm, the FDC will:

    a. Train staff on policies regarding attending clinicians' orders for required supervision, and checks for patients on SHOS, including ordering continuous observation as warranted.

    b. Train staff on FDC suicide and self-injury prevention policy in accordance with PM 404.001.

    c. Provide certified IMR cells in accordance with procedure PM 404.002.

5. **Treatment Refusers:**  For patients who resist treatment, including refusal of prescribed psychotropic medication(s), documented as a problem on their ISPs, the FDC will:

    a. Train security staff in motivational interviewing.

    b. Require mental health staff to document engagement with patients identified as treatment refusers and attempting to address those reasons in the ISP.

    c. Within 24 hours from an patient's refusal to attend a scheduled clinical encounter, the patient will be visited by the patient's case manager or other clinician member of the patient's MDST, who will counsel with the patient so that he or she will attend or participate in future clinical appointments. This will also be documented via an incidental note in the mental health record.

    d. If an patient refuses to come out of his/her cell for any SOCTS for more than one week, efforts will be made to bring the patient out of his/her cell to conduct a wellbeing check and mental status exam.  These efforts and the result of the wellbeing check and mental status exam will be documented in the patient's mental health record.  The MDST will meet to consider changing the patient's ISP.

    e. If a patient fails to attend an average of at least 50% of the scheduled structured therapeutic activities over a 30-day period, then the MDST will meet to consider changing the patient's ISP.

8

f.  Clinical staff will consult with the appropriate clinical regional staff for treatment resistant or difficult cases. Patients in the TCU with resistance to treatment issues documented on their ISP will be reviewed quarterly by regional mental health staff, and this consultation will be documented with an incidental note in the inpatient record.

g.  Patients in the CSU with resistance to treatment issues documented on their ISP will be reviewed every thirty days by regional mental health staff, and this consultation will be documented with an incidental note in the inpatient record. If the condition has not improved within a reasonable period of time further consultation is clinically indicated, then regional staff will continue consulting up their chain of command for additional options, and such consultations shall be documented with an incidental note in the inpatient record.

6.  **Discharge Planning:** The FDC will:

a.  Transfer to a different level of inpatient care or discharge from inpatient care is accomplished by consensus of the MDST. Clinical rationale for transfer or discharge must be clearly documented in the patient's records. When a patient is discharged from inpatient care, a Discharge Summary for Inpatient Mental Health Care will be completed and will include an outpatient aftercare plan to ensure the patient will be able to function adequately in the setting to which he/she is discharged.

b.  Provide clinical justification for discharge from inpatient units to a special housing setting. The MDST will meet to determine whether there is a clinical justification that, with outpatient level mental health care, the patient's mental status and level of functioning will enable satisfactory adjustment to the special housing to which the patient will be assigned. The clinical justification for discharge from inpatient to a special housing setting will be clearly documented in the patient's records, an aftercare plan will be completed prior to discharge from the inpatient unit, and the patient will have gone at least seven (7) days since the end of the last episode of psychiatric seclusion, psychiatric restraints, or self-harm observation status. Patients will not be discharged from an inpatient unit to an outpatient level of care if there has been an incident of psychiatric seclusion, psychiatric restraints or SHOS within the past seven (7) days.

7.  **Psychotropic Medication Practices:** The FDC will:

a.  Ensure patients are seeing their psychiatric practitioner in the intervals required in the FDC's policies.

b.  Ensure practitioner notes are completed in a timely manner and contain all of the required clinical information.

9

c. Ensure the psychotropic medication ordered is appropriate for the patient's symptoms and diagnosis.

d. Ensure drug exception request dispositions are considered and documented in accordance with FDC policy, including HSB 15.05.19.

e. Ensure psychotropic medication is properly and timely administered to patients.

f. Ensure that the treating mental health clinician is informed when an patient refuses any psychotropic medication.

g. Ensure there are no lapses in the availability of prescribed psychotropic medications for patients on the inpatient mental health units.

h. Ensure Medication Administration Records (MARs) are completed in accordance with FDC Policy.

**B.   Excessive Isolation and Restraints:**

1. Excessive Isolation:

The FDC will:

a. Complete individualized risk assessments to determine the level of restrictions on movement.

b. Incorporate results of the Risk Assessment Team ("RAT") as specified in Rule 33-404.108, F.A.C, or as amended, to assess patients to determine appropriateness for multi bed-celling to allow for additional interaction with others.

2. Excessive Use of Restraints:

The FDC will:

a. Conduct an individualized risk assessment, to include a validated violence risk assessment instrument to assess which patients need to be in correctional restraints.

b. Correctional restraints will not be utilized for any out of cell activities unless an individualized determination is made in accordance with the process outlined in Rule 33-404.108, F.A.C, or as amended.

c. Security will not be present in the room during treatment activities unless there is an individualized determination of risk by the treating mental health clinician warranting security presence during the activity.

10

    d.  Implement a policy that when patients are admitted to an inpatient mental health unit, prior confinement or close management status shall be suspended; for patients admitted to the CSU, a risk assessment shall be completed within 3 working days; for patients admitted to TCU or CMHTF the initial risk assessment shall be completed within 7 working days; and after the initial risk assessment restrictions on housing, program participation and clinical activities shall be determined by the MDST and shall be documented in the patient's inpatient mental health record.

    e.  Implement a policy that, after the initial risk assessment upon admission to the inpatient mental health unit, security restraints shall not be applied to patients when they are out of their cells by default because of their suspended close management status.

    f.  Patients not requiring security restraints based on their risk assessment shall have recreation in an open court or yard instead of the secured individual recreation areas. For those inpatient mental health units without current access to an open court or yard, the FDC will construct an open court or yard area for all inpatient mental health units and provide wellness equipment in accordance with statutory authority .

## C.   Disciplinary Reports in the Inpatient Units

1.  The FDC will:

    a.  Require staff to comply with policy pertinent to inpatient mental health treatment and services.

    b.  Prior to issuing a DR, require staff to consult with either the supervising psychologist or the unit psychiatrist. The consultation will be documented via an incidental note made in the mental health record.

    c.  If a DR is issued, ensure the supervising psychologist or the unit psychiatrist, documents on the DC6-1008 that the patient's mental condition either did or did not contribute to the alleged offense. If the supervising psychologist or the unit psychiatrist determines that the patient's mental condition did contribute to the offense, then s/he will make recommendations for alternate disposition or treatment interventions in lieu of a sanction.

    d.  Ensure that mental health staff attempts to resolve lower level offenses on the Inpatient Unit through behavioral techniques. These efforts will be documented in the patient's mental health record. The Parties agree the goal is to deal with those behaviors through the MDST rather than through the disciplinary process.

**D.    Medical Records**

1.  The FDC will:

    a.  Train staff regarding the elements of an organized and complete medical record.

    b.  Monitor medical records on the inpatient mental health units to ensure the records are organized, complete, and up to date and have all of the documentation necessary to support the provision of adequate treatment and care to patients.

**E.    Coordination Between Medical and Mental Health Providers**

1.  The FDC will:

    a.  Order labs on DC4-714B clinician order sheet.

    b.  Ensure that mental health encounter sheets are completed.

    c.  Ensure that mental health encounters are forwarded to data entry for appropriate entry in OBIS and laboratory system.  All entries will have an appropriate clinician staff ID.

    d.  Once lab results are received, they will be separated by ordering clinicians and forwarded to Mental Health Providers for review.

    e.  Ensure that, 48 hours from the time labs are received, the results will be entered into OBIS and data entry will generate a lab tracking log to forward to the ordering clinicians.  Upon request, medical records staff can also generate a report from laboratory record system listing all mental health labs ordered and results by clinician.

    f.  Ensure that, on weekends, the on-call psychiatrist will be contacted about any abnormal lab results.  Further, lab reports will be put in provider's mailboxes on the unit for review of abnormal lab results.  That review will occur by the next business day.

    g.  Ensure that all prescribing staff will have OBIS and laboratory record system accounts with passwords.  The staff will receive training on both systems, both initially and periodically as needed.

    h.  Require clinicians to follow the guidelines outlined in Appendix 1 to HSB 15.05.19 regarding baseline laboratory tests and timeframes for follow up laboratory tests.

    i.  Ensure each inpatient unit has unit clerks responsible for monitoring the entry of lab requests and the return of the lab results.  The clerks will maintain a log for lab

requests that includes the lab order date, the draw date, and the date that results were received.

j. Provide at least two computers on each Inpatient Unit so that providers will be able to access both the OBIS and the laboratory record systems.

k. Incorporate primary care into MDST meetings to develop effective communication and include documentation in the records of communications between medical and mental health staff.

l. Ensure there will be a MDST note indicating medical and mental health providers have consulted regarding coordination of care for any patients attending a chronic care clinic.

## F.   Training

1. The FDC will oversee that the following training is provided on an annual basis, as follows:

a. Mental health clinical staff will receive training on the development, implementation, and revision of ISPs.

b. All clinical and nursing staff, classification, and security staff working in the mental health inpatient unit will receive training regarding the purpose, required attendees and substance of an appropriate MDST meeting. The training will include a discussion about both routine MDST meetings for patients as well as events triggering the need for an MDST meeting for an patient.

c. Clinical and security staff will receive training on the prevention, management, and treatment of patients at risk to engage in self injurious behavior.

d. Clinical staff will receive training on appropriate organization and timely completion of medical records.

e. Psychologist, psychiatrist, and security staff will receive training on the proper procedure, documentation and considerations in determinations regarding whether to discipline a patient for behavior on the mental health inpatient units.

f. Clinical and security staff will receive training on the identification and assessment of suicide risk, suicide prevention, SHOS procedures and required supervision of patients on SHOS.

g. Clinical and security staff routinely assigned to the inpatient mental health units will receive training on how to conduct individualized assessments for use of restraints, the application of restraints on the inpatient mental health units, and the use of ETOs.

    h.  Security staff routinely assigned to an inpatient mental health unit will receive CIT training, and at least eight hours of specialized training pertinent to the inpatient mental health units.

**G.  Oversight**

   1.  The FDC will:

      a.  Maintain central office and regional ombudspersons.

      b.  Maintain BRMT and reviews.

## V.  MONITORING TEAM

**A.  Monitoring Team Selection**

1. Monitoring of the implementation of this Agreement shall include the processes and authority of the Correctional Medical Authority (CMA), as provided in Section 945.601, et. seq., Florida Statutes.  The CMA shall select a Monitoring Team to monitor implementation of this Agreement.  The CMA shall provide the names and CVs of each team member to the Parties for review and comment prior to hiring.

2. The CMA will draft a monitoring tool based on the content of the Agreement.  The Parties will jointly review and comment on the monitoring instrument to be used by the CMA monitoring team to measure compliance with this Agreement.  The CMA will be the final decisionmaker with regard to the monitoring instrument.

3. The Parties shall file the CMA-approved monitoring instrument with the Court no later than March 15, 2018.

4. Neither Party, nor any employee or agent of either Party, shall have any supervisory authority over the CMA monitoring team's activities, reports, findings, or recommendations.

5. Should the Parties agree that the CMA monitoring team or individual CMA team members are not fulfilling their duties in accordance with this Agreement, the Parties may amend this Agreement to immediately remove and replace the CMA monitoring team with an agreed upon monitor.

**B.  Monitoring Team Qualifications**

The Monitoring Team shall be hired as independent contractors of the CMA.  The Team shall, at a minimum, consist of a psychiatrist, a psychologist, a psychiatric nurse practitioner, a registered nurse, and at least two licensed clinical social workers or licensed mental health clinicians. The CMA monitoring team shall have appropriate experience and education or training related to the subject areas covered in this Agreement. Each member

of the CMA monitoring team should have significant experience working on an inpatient mental health unit either in the community, a jail, or a state or federal prison.

**C.    Monitor Access**

1.  The CMA monitoring team shall have full and complete access to the FDC's inpatient units, all unit records, patient medical and mental health records, staff, and patients.

2.  FDC will direct all employees and agents to cooperate fully with the CMA monitoring team. All information obtained by the team shall be maintained in a confidential manner.

**D.    Monitoring Team Ex Parte Communications**

The CMA monitoring team, through the CMA executive director, shall be permitted to initiate and receive ex parte communications with all Parties.

**E.    Monitoring Team Distribution of FDC Documents, Reports, and Assessments**

The FDC will continue its contract monitoring, BRMT assessments and any other routine monitoring or assessments of the inpatient mental health units. Any assessments, reports or monitoring shall be provided to the CMA monitoring team within seven days of completion. Within seven days of receipt by the team, the team shall distribute the assessments, reports or routine monitoring documents to DRF.   Additionally, any documents the CMA monitoring team requests and receives from the FDC to determine compliance will be copied and sent to DRF within seven days of receipt.

**F.    Limitations on the Monitoring Team**

1.  The Parties agree that the monitoring team shall be limited as follows:

    a.  If the CMA is required to contract for additional staff, the Parties' experts shall not be eligible to be retained to provide monitoring of this Agreement.

    b.  The CMA shall monitor this Agreement separate and apart from its statutorily mandated survey requirements.

    c.  Reports issued by the CMA monitoring team shall not be admissible against the FDC in any proceeding other than a proceeding related to the enforcement of this Agreement or the filing of a new case in accordance with the circumstances outlined in Section VIII(H) below.

**G.    Technical Assistance by the Monitoring Team**

The CMA monitoring team shall provide the FDC with technical assistance as requested by the FDC. Technical assistance should be reasonable and should not interfere with the team's ability to assess compliance.

## VI.    COMPLIANCE ASSESSMENTS

**A.    Compliance Assessments**

1. The CMA monitoring team shall evaluate the level of compliance for each relevant provision of the Agreement using a monitoring instrument reviewed by the Parties.

2. The CMA's monitoring team shall evaluate the level of compliance for each relevant provision in the Agreement based on a multi-day site visit to each inpatient mental health unit that includes, but is not limited to, the monitoring team:

    a. Receiving demographic information for the inpatient mental health unit, a unit roster, the unit restraint logs and any other information the monitoring team deems necessary prior to the site visit;
    b. Interviewing a representative sample consisting of a minimum of 10% of the patients on the inpatient mental health unit ;
    c. Reviewing records for the randomly selected patients on site;
    d. Review disciplinary action taken against patients on the inpatient mental health unit on site;
    e. Interviewing mental health and correctional staff on site;
    f. Observe SOCTS;
    g. Observe rounds and medication administration;
    h. Observe an MDST meeting;
    i. Observe recreation.

3. The CMA monitoring team shall conduct a compliance assessment for each inpatient unit as outlined in the implementation schedule below, and shall develop a report for each inpatient facility.

4. Each CMA monitoring team report shall describe the steps taken by each member of the CMA monitoring team to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of team's findings.

5. For any deficiency found by the CMA monitoring team, the team shall determine whether insufficient clinical, nursing or security staffing levels may have caused or contributed to such deficiency.

6. Any deficiencies found by the CMA monitoring team to be life-threatening or otherwise serious shall be immediately reported to the Secretary of the Department of Corrections as provided in Section 945.6031(3) and to the Parties.

7. The FDC will achieve seventy (70) percent compliance at each institution for each of the items in the agreed upon monitoring tool for the first compliance monitoring period.

8. Substantial compliance shall be reached when the FDC obtains eighty (80) percent compliance at each institution for each of the items in the agreed upon monitoring tool for the second compliance monitoring period.

9. The Parties shall have the right to observe the assessments.

**B.    Implementation**

This Agreement shall be implemented as follows:

1. The CMA Monitoring Team shall conduct two rounds of monitoring with each inpatient unit being assessed at least once during each monitoring period as outlined below.

2. The first monitoring period shall begin December 2018 and be completed no later than October 2019.

3. The second monitoring period and the final reports shall be completed no later than October 2020.

4. The CMA monitoring team shall provide reports to the Parties no later than 30 days after completion of each assessment.

5. If more than one visit per monitoring period is necessary for an inpatient unit, the CMA monitoring team shall inform the Parties of the reason(s) for the follow up visit(s).

**C.    Monitoring Team's Reports**

1. The CMA monitoring team shall provide to the Parties reports evaluating the extent to which the FDC has complied with each substantive provision of the Agreement. The Parties shall have seven days to provide a written response to the findings. The written response will be submitted to the CMA and the other Party.

2. The CMA monitoring team shall consider the Parties' responses and make appropriate changes, if any, and issue the final report within seven days of receiving the Parties' response(s), if any. These reports shall be written with due regard for the privacy interests of individual patients and staff, and the interest of Defendants in protecting against disclosure of information not permitted by this Agreement.

## VII.    DOCUMENTS TO BE PRODUCED TO DRF

During the duration of this Agreement, the FDC will provide to DRF the following documents on a quarterly basis:

A.    Contract Monitoring Reports for institutions with inpatient units;
B.    BRMT Reports and STAMIs for inpatient units;
C.    Name and location of death for any patient who died while assigned to an inpatient unit;

D.   All DC-4-781J Psychiatric Restraint Log, regarding use of psychiatric restraints on the inpatient units;

E.   Inpatient unit schedules of activities; and

F.   A roster of patients assigned to each inpatient unit from the first of each month that includes, at a minimum, admission date and S-grade.

## VIII.   DISPUTE RESOLUTION AND ENFORCEMENT

A.   If Plaintiff believes the FDC is not in substantial compliance with any provision of this Agreement, Plaintiff shall provide the FDC, in writing, specific reasons why they believe that the FDC is not in substantial compliance with such provision or provisions, referencing the specific provision or provisions. Plaintiff may not allege that FDC is not in substantial compliance based on minor or isolated delays in compliance.  Substantial compliance, as provided for in this Agreement, shall be achieved if:

   1.   The FDC performs its essential, material components of this Agreement, even in the absence of strict compliance with the exact terms, or

   2.   Any delays in compliance with the Agreement are minor and/or isolated.

B.   To the extent Plaintiff relies on observations or opinions of the CMA to support an allegation that the FDC is not in substantial compliance, Plaintiff shall make a reference to the written reports of the monitoring team and to portions thereof which support Plaintiff's belief.  To the extent Plaintiff relies upon documents provided by the FDC to support an allegation that the FDC is not in substantial compliance, Plaintiff shall make reference to the specific performance measures which support Plaintiff's belief.

C.   The FDC shall have the opportunity to consult their designated expert, if any, with respect to Plaintiff's allegations that the FDC is not in substantial compliance with such provision or provisions. The FDC shall provide Plaintiff with a written response to the notification within thirty (30) days of its receipt. The FDC's response shall contain a description of the steps it took to investigate the issues addressed in the Plaintiff's notice, the results of the investigation, and, where the FDC proposes corrective action, a specific plan and corrective action for addressing the described issues. If no corrective action is proposed by reason of legal considerations or for other reasons, the FDC's response shall specifically state those reasons and any statutes, regulations, expert opinion, or technical bases upon which they are relying in reaching such conclusion.

D.   Plaintiff agrees to advise the FDC of its acceptance or rejection of the FDC's response within ten (10) days of its receipt. The Parties shall meet to discuss and attempt to resolve any disputes addressed in the written submissions. The FDC and Plaintiff shall meet within twenty (20) days of Plaintiff's rejection of the FDC's response, unless a later meeting is agreed by both sides. The CMA monitoring team will participate in these meetings to offer evaluations of the disputed conditions and recommendations for resolution.  The Parties may engage a Mediator to assist with resolution of the dispute.

E.   If the FDC and Plaintiff are not successful in their efforts to resolve their dispute, Plaintiff may seek relief from the Court to effect substantial compliance with the provisions of the Agreement alleged to have been breached. All remaining provisions of the Agreement will remain in full force and effect.

F.   In the case that the CMA Monitoring Team identifies a situation that is life-threatening or otherwise serious and contemplated by this Agreement, DRF may, after 72 hours notice to the Defendants, omit the notice and cure requirements herein and seek relief from the Court.

G.   In the case that DRF identifies a non-systemic situation that is life-threatening or otherwise serious and contemplated by this Agreement, DRF may, after 72 hours notice to the Defendants, omit the notice and cure requirements herein and seek relief from the Court.

H.   The Parties recognize that the Agreement includes plans for activities extending beyond the current fiscal year. The FDC will exercise reasonable efforts to secure the legislative appropriations necessary to meet the terms of the Agreement. The inability to perform any act required under the Agreement due to non-appropriation of funds, so long as those funds are necessary to implement or support the Agreement, shall not be a basis for holding the Secretary in contempt so long as the FDC exercised reasonable efforts to secure the appropriation at issue. If the inability to perform is the result of non-appropriation of funds, DRF may file a motion to enforce the Agreement with respect to those issues which it contends amount to a breach of the Agreement, or file a new lawsuit with respect to those issues which it contends amount to systemic violations of federal law and the official capacity agency head of the FDC will not raise the defense of collateral estoppel or res judicata in an action for prospective declaratory and injunctive relief.

I.   The Parties acknowledge that failure to obtain necessary funding does not preclude the Court from entering any order to achieve compliance with this Agreement that comports with the applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. section 3626 and with other applicable law, provided that the FDC reserves the right to assert that the lack of funding should be taken into account in any remedial order.

J.   If Plaintiff contends that the FDC has not complied with an order entered under the preceding paragraphs, they may, after reasonable notice and a meeting with the FDC, move for further relief from the Court to obtain compliance with the Court's prior order. The Court may apply equitable principles and may use any appropriate equitable or remedial power available to it.

## IX.   PLAINTIFF'S ACCESS TO CLIENTS AND CONSTITUENTS

Nothing in this Agreement shall be construed to limit Plaintiff's federally-mandated access to its clients and constituents at any of the inpatient mental health units.

## X.    PLAINTIFF'S ATTORNEYS' FEES AND COSTS

A.    **Fees and Costs:** The FDC agrees that Plaintiff is entitled to payment of reasonable fees and costs up to adoption of the Agreement by the Court in an amount to be determined by the Parties. If the Parties cannot reach resolution, the issue will be resolved through mediation. If the Parties cannot reach resolution through mediation, then the Court will determine reasonable fees and costs.

B.    **Timing:**

   1. The FDC agrees it will pay the Plaintiff its reasonable fees and costs accrued through the date of adoption of this Agreement. Within 30 days of adoption of the Agreement by the Court, Plaintiff will submit its fees and costs to the FDC. FDC will respond to Plaintiff's fees and costs request within 60 days of receipt. The Parties will have 30 days from receipt of the FDC's response to resolve the fees and costs before submitting a motion to the Court for resolution of fees and costs.

   2. In the event enforcement proceedings are initiated, Plaintiff may seek additional fees and costs for successful enforcement activities during the duration of the Order.

## XI.    MODIFICATION

A.    The Parties recognize the change of some conditions or practices may reduce the necessity of change to other conditions or practices. Therefore, it may be appropriate that the Agreement be modified from time to time. After no less than six (6) months of operation under the Agreement, FDC may ask Plaintiff to review a proposed modification, amendment, or alteration of any of the rights or obligations in any portion of this Agreement.

B.    If Plaintiff agrees with the proposed modification, the Parties will seek Court approval of the modification, amendment, or alteration.

C.    If Plaintiff disagrees with the proposed modification, the Parties will meet and confer as to whether they can reach agreement. If the Parties cannot agree within thirty (30) days, the Parties will seek the assistance of a mediator to resolve the dispute.

D.    If mediation is not successful, then appropriate relief may be sought from the Court in the form of a motion for modification.

## XII.    PLRA

Pursuant to 18 U.S.C. § 3626(a)(1)(A), the Parties have submitted this Agreement to the Court seeking a finding that the relief agreed to by Plaintiff and the FDC and required by this Agreement is narrowly drawn, extends no further than necessary to correct the alleged violation of the patients' constitutional rights, and is the least intrusive means necessary to correct the violation. The Parties agree that the Court must consider any adverse impact on public safety or the operation of a

20

criminal justice system.  The Parties stipulate that no provision of this Agreement has an adverse impact on public safety or the operation of the criminal justice system.  Additionally, the FDC agrees it will not move to terminate the Agreement pursuant to 18 USC 3626(b) any sooner than than the termination of the jurisdiction of the Court pursuant to Section XIII(C)(2).

## XIII.   COURT APPROVAL AND JURISDICTION

A.   **Scope:** The Parties hereby memorialize the terms of their agreement in this Agreement. This Agreement constitutes the entire agreement of the parties and, except for any Protective Order entered by the Court, supersedes all prior agreements, representations, negotiations and undertakings in this litigation not set forth or incorporated herein.

B.   **Court Adoption:** The Agreement is not effective absent adoption by the Court as an order of the Court.

C.   **Jurisdiction:**

1.  The Court shall be the sole forum for the enforcement of this Agreement.

2.  The terms of this Agreement and the jurisdiction of the Court shall commence upon the date of the Court's adoption of this Agreement as an order of the Court and shall extend from the date of adoption until December 31, 2020 or 60 days after the receipt of the final monitoring report, whichever is sooner.

3.  The jurisdiction of the Court shall terminate on December 31, 2020  or 60 days after the receipt of the final monitoring report, whichever is sooner, unless Plaintiff files a motion to extend jurisdiction based on the argument that prospective relief remains necessary to correct a current and ongoing violation of the Federal rights.

4.  Nothing in this Agreement shall limit the Parties' rights to challenge or appeal any finding as to whether the FDC is not in substantial compliance, i.e., in substantial non-compliance, or consequent order entered by the Court.

IN WITNESS WHEREOF, the Parties to this Settlement Agreement have executed the same through the signatories below:

For Plaintiff:

_____

Maryellen McDonald
Executive Director, Disability Rights Florida

Dated:

12/22/2017

For Defendants:

_____

Julie L. Jones
Secretary, Florida Department of Corrections

Dated:

12/22/17